**UNITED STATES of America,**
**Plaintiff,**

v.

**Jenaro B. RAMON, Defendant.**

**No. P:99–CR–299.**

United States District Court,
W.D. Texas,
Pecos Division.

Feb. 25, 2000.

Jeffrey Parras, Assistant United States Attorney, Midland, TX, for United States.

Eva–Marie Leahey, Odessa, TX, for defendant.

## AMENDED ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

FURGESON, District Judge.

Before the Court is Defendant Jenaro Ramon's Motion to Suppress Evidence, filed October 29, 1999. After due consideration of the Motion, the facts of the case, and relevant law, the Court is of the opinion that the Motion should be GRANTED.

### ISSUE

The Court must determine whether, in the absence of other factors, the vehicular display of religious symbols and decals may give rise to reasonable suspicion supporting the constitutionality of a roving Border Patrol stop.

### FACTS

The evidence sought to be suppressed is 482 pounds of marijuana seized from the Defendant on August 25, 1999, while he and a companion were traveling north on U.S. Highway 385.

At approximately 3:30 p.m. on August 25, 1999, United States Border Patrol Agents Andrew Graham and Martin Tashman (collectively referred to as the

"Agents") were standing outside the Border Patrol checkpoint located on Highway 385, south of Marathon, Texas, when they noticed Defendant's Suburban pass the station traveling north. The Agents had come on duty at 2:00 p.m. that afternoon, and were briefed in Alpine and assigned roving patrol duties on Highway 385. Roving patrol duties include traffic observations, such as monitoring northbound traffic, responding to vehicle sensors, and watching for other signs of alien traffic. Border Patrol agents assigned to roving patrol on U.S. 385 focus on northbound traffic because U.S. 385 is a known corridor for alien and narcotics smuggling. The Agents had been at the checkpoint for approximately ten to fifteen minutes before Defendant passed by, and were wearing Border Patrol caps and the green, short-sleeved uniforms of the Border Patrol, which bear a visible badge. They were standing near their clearly marked U.S. Border Patrol vehicles as they monitored traffic.

To appreciate the enormity of the task faced daily by U.S. Border Patrol agents assigned to the Alpine station, one need only consider the territory in which they operate. The area patrolled by the Agents is vast and is a veritable hotbed of alien and narcotic smuggling. The Border Patrol station located at Alpine, Texas operates two immigration checkpoints, the one on U.S. 385, and a second on U.S. Highway 118, south of Alpine, Texas. Highway 385 originates in the Big Bend National Park, the southern border of which is formed by the Rio Grande River and Mexico. Highway 118 originates to the south at Study Butte and Terlingua, Texas, and goes into the Big Bend National Park. Both checkpoints are located in Brewster County, the largest county in Texas. Spanning 6,193 square miles, Brewster County is bordered on the south by the Rio Grande River and Mexico.

The nearest lawful port of entry to the U.S. 385 checkpoint upriver is at Presidio, Texas; and down river, at Del Rio, Texas.

More than 200 miles separate these two points. Agent Tashman testified to his familiarity with the Rio Grande River area in south Brewster County, and the numerous low water points where it is possible to wade or drive across from Mexico. From their lookout at the U.S. 385 checkpoint where they first spotted Defendant, the Agents were about thirty miles north of the Big Bend National Park, and about sixty-five to seventy miles from the closest point on the border, measured in road miles. The only paved road intersecting 385 south of the checkpoint is Highway 2627, which branches off U.S. 385 and leads to La Linda, a border town. The intersection of Highways 385 and 2627 is thirty miles south of the 385 checkpoint, and the nearest river crossing is twenty-six miles from the intersection.

Agent Tashman and Agent Graham complete their third year of service in the Border Patrol in January, 2000. Both Agents have been assigned to the Alpine station for approximately two and a half years, since the completion of their intensive training course. During their respective two and a half years in Alpine, the Agents have learned to detect criminal activity by attention to certain suspicious factors. Several factors made them suspicious of Defendant and his traveling companion on August 25, 1999.

Agent Graham and Agent Tashman bore in mind the recent apprehension of several loads of drugs and aliens on U.S. 385 as they monitored the traffic passing by the checkpoint on August 25. Only one week before, two loads of narcotics were seized in a single day. Agent Graham was involved in one of these seizures; he aided in the apprehension of marijuana from a northbound vehicle while assigned to roving patrol on U.S. 385. Both Agents were also aware that agents working the midnight shift had recently apprehended aliens along U.S. 385.

The 385 checkpoint was not functioning at the time Defendant passed by. The Border Patrol does not schedule regular

operating hours for checkpoints, and only operates the 385 checkpoint when at least three agents are on duty. Shift changes do occur regularly at 2:00 p.m., and during a shift change, the checkpoint is unmanned. There was no shift change at the 385 checkpoint that day because it was not functioning, but the Agents first saw Defendants within one and a half hours of a shift change at the Alpine station. The proximity in time between the shift change and Defendant's passing by the checkpoint raised Agent Tashman's suspicion, as smugglers will often use the shift change as an opportunity to bypass a checkpoint.

Neither Agent Tashman nor Agent Graham recognized Defendant's Suburban as a local vehicle. Naturally, Agents Tashman and Graham are not familiar with all of the traffic along U.S. 385, due to the fact that Brewster County is large, and Big Bend National Park is a tourist attraction that draws hundreds of thousands of visitors annually. Nevertheless, during their period of service at the Alpine station, Agents Tashman and Graham have familiarized themselves with many of the local vehicles that routinely use 385, and recognize many of the vehicles belonging to the approximately one hundred fifty to two hundred residents of Panther Junction, located south of the 385 checkpoint. Agent Tashman acknowledged that his failure to recognize a vehicle, taken alone, is not indicative of criminal activity. He did note that, in his experience, there is little traffic in the area at all during the time at which Defendant was sighted, except for major holidays.

Perhaps the predominant basis for the Agents' suspicion was the overly friendly greeting they received from the Suburban's occupants. Agent Tashman testified that the female passenger was literally hanging out of her window, pumping her arm back and forth above her head in an exaggerated greeting when the Suburban passed the checkpoint. Both Agents could see that the driver was waving as well, and this activity continued from the time the Agents first saw the vehicle until it had passed the checkpoint.

In addition to the frenetic salutations offered by the occupants of the Suburban, Agent Tashman was alerted to the possibility of illegal activity by some of the attributes of the vehicle itself. Two different types of antennas were visible on top of the cab, one of which appeared to be a CB radio antenna, and the other for a cell phone. They did not appear to be typical factory-installed antennas. Agent Tashman's experience informed him that these could be smugglers, who will often use radios and cell phones for "scouting" highways. In what is known as a "lead-load" configuration, a "lead" vehicle will go ahead and scout for law enforcement, and then radio or call the "load" car when the coast is clear. Although the Agents had not been alerted to the presence of two vehicles traveling in tandem, Agent Tashman did state that the Agents had only been at the checkpoint for ten to fifteen minutes before seeing Defendant, and would not have known if another vehicle had passed before their arrival. Of course, there are plenty of legitimate uses for antennas of the type on top of Defendant's vehicle, and their presence alone is not indicative of criminal activity.

Agents Tashman and Graham also noticed that the windows of the Suburban were heavily tinted, such that the rear of the vehicle was not visible. Heavy tinting is one method of obscuring the view into a vehicle, where aliens or narcotics may be hidden. Agent Tashman admitted that he is not responsible for ticketing for traffic violations, and therefore is not familiar with the Texas traffic laws as they relate to the permitted degree of tinting. In southwestern Texas, where August temperatures routinely top 100 degrees Fahrenheit, tinting alone is not a sign of criminal activity; indeed, it may be considered a sign of common sense. During the suppression hearing, Defendant's Exhibits 1 and 2 were entered, depicting the vehicle and the tint on the windows. Defendant

Tashman acknowledged that the exhibits fairly represented the vehicle he stopped that day, except that the window tinting looked different when the vehicle was parked in the shade, as it was when the pictures were taken, than when it was moving on a sunny highway. Government's Exhibits 1, 2, and 3 depict the back, profile, and front of the Suburban, but because of their grainy quality, do not accurately represent the tinting as it would have appeared to the Agents prior to making the stop either.

After the Defendant passed the checkpoint, Agent Tashman and Agent Graham agreed that the Suburban looked suspicious and decided to follow it in their respective vehicles. The Suburban appeared at all times to be traveling at normal highway speeds, and Defendant appeared to be driving in a normal manner. Never losing sight of the vehicle, the Agents caught up to it in about two minutes and ran the registration. The search indicated that the vehicle was registered to "Gloria Martinez" of Lubbock, Texas. Agent Tashman testified that Lubbock is a popular destination for aliens and drugs and that it had recently been the destination of such contraband. Of course, Lubbock has many law-abiding residents as well, and the fact of a Lubbock registration is not alone indicative of criminal activity. The registration information was not otherwise remarkable, since Defendant was traveling with an Hispanic female.

While trailing the vehicle, Agent Tashman noticed three religious decals on the back of the car: one metallic fish symbol, one Virgin Mary sticker, and one sticker proclaiming a religious phrase. Agent Tashman testified that he had been trained to look for religious decals and symbols, as they may be used by smugglers to mask criminal activity. He also testified as to the popularity of these symbols and stickers in the region, often displayed on the vehicles of individuals with more sincerely-held religious beliefs than Defendant and his companion. Government Exhibit 1, a picture of the rear of the Suburban, shows the religious symbols. Agent Tashman has been trained to write reports and recognizes the importance of the reports for use by the U.S. Attorneys Office and to refresh recollection prior to trial. He acknowledged that there was no reference to the religious symbols in his report.

The Agents conferred over their radios and agreed to stop the vehicle. Once stopped, Agent Tashman approached the driver's side and told Defendant that he was a Border Patrol agent conducting a Border Patrol check. While Agent Tashman was in the process of ascertaining the citizenship of the two occupants, Agent Graham exited his vehicle with his K9, "Body" (rhymes with "Jodie"), and positioned himself at the rear of his vehicle to act as backup. Upon closer inspection, Agent Graham noticed that the window tinting was darker than most vehicles he had encountered. Concerned about the possibility of armed individuals in the cargo area, Agent Graham placed his hands on the glass and looked through them. In the cargo area, he could see a large mound, covered by a blanket and topped by a spare tire. When he looked down, he saw that Body was signaling to the presence of contraband in the truck. While Agent Tashman was speaking to the female passenger, Agent Graham indicated that Body had alerted to the presence of some form of contraband in the vehicle. Agent Tashman acknowledged Agent Graham, completed his questioning of the female passenger, and asked the occupants to exit the vehicle so that the Agents could search it. At this point, Agent Tashman noticed that the female passenger was somehow injured and was having trouble moving.

As Agent Tashman assisted Defendant in exiting the vehicle and getting to a safe place on the side of the highway, Agent Graham opened the rear of the vehicle, lifted the blanket, and found Mexican flour sacks containing wrapped bundles, which appeared to be narcotics. Government's

Exhibit 4 is a picture of the sacks of marijuana in the back of the vehicle before they were unloaded. While Agent Graham continued to search the vehicle, Agent Tashman arrested Defendant. The female passenger was arrested as well.

Agent Tashman testified that he did not interview Defendant, but that Defendant did exclaim "you've got me." Agent Graham interviewed Defendant, and after informing him that he was under arrest for the possession of narcotics, Agent Graham asked Defendant whether he would be willing to cooperate with the Agents, even though Agent Graham lacked the authority to offer him leniency in exchange for his cooperation. Defendant agreed, and recounted the events that had culminated in his arrest. He informed Agent Graham that an individual named "Junior" had arranged for the Defendant to transport the drugs. Pursuant to "Junior's" instructions, Defendant traveled down Highway 118 to the Big Bend National Park, and parked at the Santa Elena crossing. There, some unnamed men loaded the sacks into the Suburban. Defendant next drove through the Park and proceeded to Highway 385. "Junior" was supposed to scout the highway and radio Defendant when the coast was clear before Defendant proceeded up Highway 385. Proving that even the best-laid plans can go awry, Defendant got no word from "Junior" but decided to try his luck anyway.

Prior to interviewing Defendant, Agent Graham assisted the female passenger in getting out of the vehicle. He found that the injury noticed by Agent Tashman was due to recent leg surgery, for which she was on pain medication. She was also diabetic. The female passenger denied any knowledge of the marijuana and claimed that she was only along to sightsee. Despite her apparently debilitating injury, she claimed that she had wandered off to take pictures during the time that the vehicle was being loaded, and when she returned, she and Defendant left the Park.

Agent Tashman was not present when the vehicle was later searched at Alpine. Agent Graham searched the vehicle and found three false compartments inside: one hole in the floor allowed access to the gas tank, and two holes in the sheet metal on the border panels on the sides of the trunk led to further hidden compartments. Government's Exhibit 6 is a picture of the hole in the inside left rear border panel, showing excess "bondo" used to seal the holes. Exhibit 5 is a picture of the hole cut in the floor of the vehicle.

## DISCUSSION

The essential purpose of the Fourth Amendment is to "shield the citizen from unwarranted intrusions into his privacy." *Jones v. United States*, 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). In some instances, however, it is possible for wrongdoers to use the protections afforded by the Fourth Amendment as a sword to escape liability. In the instant case, it is undisputed that 482 pounds of marijuana were seized from Defendant. The question is whether Defendant can be tried for the possession of the drugs.

The Court must determine the constitutionality of the stop of Defendant executed by Agent Tashman and Agent Graham. If the Court determines that the stop violated Defendant's constitutional rights under the Fourth Amendment, then the marijuana seized is considered "fruit of the poisonous tree" evidence and must be suppressed. Furthermore, the Court will consider whether the stop constituted other possible constitutional or statutory violations.

### A. Factors that may be considered when making a roving patrol stop

In determining when roving patrols of the U.S. Border Patrol may constitutionally stop an automobile in the border region, the Supreme Court enunciated the following factors that officers may consider in

*U.S. v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975):

(1) Characteristics of the area in which they encounter the vehicle;

(2) Proximity to the border;

(3) The usual patterns of traffic on that particular road;

(4) Previous experience with alien traffic;

(5) Information about recent illegal border crossings in the area;

(6) Erratic driving;

(7) Obvious attempts to evade officers;

(8) Aspects of the vehicle—such as a station wagon with large fold-down seats or spare tires;

(9) Whether the vehicle appears heavily loaded;

(10) Whether the vehicle has an extraordinary number of passengers;

(11) Whether the officers observe passengers trying to hide;

(12) Characteristics of a person living in Mexico, such as mode of dress or haircut.

*See Brignoni–Ponce*, 422 U.S. at 884–85, 95 S.Ct. 2574.

■ *Brignoni–Ponce* does not give more weight to one factor than any other and specifically stresses that it is "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion...." *Brignoni–Ponce*, 422 U.S. at 884, 95 S.Ct. 2574. The list of factors is not intended to be exhaustive; other elements may be considered in deciding whether to make an investigatory stop. *See id.* In *U.S. v. Cortez*, 449 U.S. 411, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981), the Supreme Court expanded the scope of a border stop to allow agents to stop and check vehicles suspected of engaging in criminal activity. The Court set forth a test for evaluating the constitutionality of a stop: whether, taking into account "the totality of circumstances—the whole picture," the officer has "a particularized and

objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. at 411–12, 101 S.Ct. 690.

In analyzing whether a stop is proper, the Supreme Court in *Cortez* looked at two elements to determine whether the assessment of the whole picture yields a particularized suspicion. First, the assessment must be based upon all the circumstances, as they are set forth in objective observations, information from police reports, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. *See id.* at 418, 101 S.Ct. 690. This evidence should be weighed and inferences and deductions drawn by a trained law enforcement officer. *See id.* Secondly, the assessment made should raise a suspicion that the individual stopped is engaged in illegal activity or wrongdoing. *See id.* This allows a Border Patrol agent to assess all factors to determine the likelihood that a vehicle is engaged in illegal activity.

■ Since *Brignoni–Ponce*, the Fifth Circuit has attempted to lend guidance to district courts as they reviewed stops in the border region. The result of their efforts has been to mandate two additional rules. In assessing the reasonableness of a border stop, a "vital element" is whether the Border Patrol Agents had reason to believe that the vehicle came from the border, and when a stop occurs a "substantial distance" from the border (defined by the Fifth Circuit as more than fifty miles), this "vital element" is missing. *See United States v. Rubio–Hernandez*, 39 F.Supp.2d 808, 810 (W.Dist.Tex.1999) (citing *United States v. Pallares–Pallares*, 784 F.2d 1231, 1233 (5th Cir.1986); *United States v. Inocencio*, 40 F.3d 716, 722 (5th Cir.1994)). If this "vital element" is missing, all other factors must be viewed "charily." *Rubio–Hernandez*, 39 F.Supp.2d at 810; *see also United States v. Pena–Cantu*, 639 F.2d 1228, 1229 (5th Cir.1981).

**B. Application of the Brignoni–Ponce factors**

In this case, the rigidity of the "fifty mile rule" may well be outcome-determina-

tive. Although 65–70 miles is on many scales "proximate" to the border, under Fifth Circuit law, it is considered a "substantial distance" from the border. In the absence of the "vital element" of proximity to the border, the Court must view charily the other factors considered in making the stop.

█ The notorious reputation of U.S. Highway 385 as a drug and alien smuggling route certainly adds to the likelihood that vehicles traveling along it might be involved in illegal activity. Agent Graham and Agent Tashman are experienced Agents whose difficult job it is to control the area's high volume of contraband smuggling. The Court recognizes that the Agents' awareness of the recent apprehension of drugs and aliens along U.S. 385 would heighten their suspicion of vehicles traveling north on the highway. In fact, Agent Graham had been part of a roving patrol stop that seized marijuana from a vehicle traveling north on Highway 385 only one week before. However, legitimate traffic often travels U.S. 385 as well, and the fact of criminal activity in the area does not justify stopping any vehicle using the road. Thus, the Court must accord this factor little weight.

█ The Agents' familiarity with local traffic may assist them in identifying non-locals. Both Agents testified that they did not recognize Defendant's Suburban as a local vehicle, and was not part of the usual traffic on the particular road. Agent Tashman also testified that there is generally little traffic during the time of day when Defendant was stopped. However, because Highway 385 is one of the major routes into Big Bend National Park, and is therefore heavily traveled by tourists and other legitimate traffic, the fact that the Agents did not recognize Defendant is accorded little weight.

█ From time to time the failure to acknowledge officers or the overly-friendly greeting of officers has been cited as a factor used in making a stop. *See, e.g.,* *United States v. Orozco,* 191 F.3d 578 (5th Cir.1999) (concluding that driver's failure to make eye contact one of several factors creating reasonable suspicion); *United States v. Moreno–Chaparro,* 157 F.3d 298 (5th Cir.1998) (according little significance to driver's surprised expression); *United States v. Nichols,* 142 F.3d 857 (5th Cir. 1998) (according no weight to driver's failure to look at agents when they shined a flashlight in his vehicle). The Court must be conservative in according import to the "opthalmological reactions" of the driver, in light of Fifth Circuit case law that instructs that "in the ordinary case, whether a driver looks at an officer or fails to look at an officer, taken alone or in combination with other factors, should be accorded little weight." *Moreno–Chaparro,* 157 F.3d at 301; *United States v. Lopez,* 564 F.2d 710, 712 (5th Cir.1977) (finding that "reasonable suspicion should not turn on mere . . . opthalmological reactions."). The Court is persuaded by the government's argument that the instant case is not ordinary, in the sense that the Agents did not rely merely upon the subtle reaction or failure to react of the driver. Rather, the Agents testified that the exaggerated nature of the Defendant and his passenger's greeting was unlike anything they had seen before. The Court believes that this behavior rises above a mere "opthalmological reaction" and therefore accords this factor some weight.

█ The Agents partially relied on the proximity of the time of day at which Defendant passed the checkpoint to the regular time of a shift change. Although it seems logical that smugglers might use a shift change as a window of opportunity during which to bypass a check point, the Fifth Circuit has stated categorically that this coincidence cannot be considered. *See Moreno–Chaparro,* 157 F.3d at 300. The proximity in time between the shift change and Defendant's passing by the check point is thus accorded no weight.

█ No weight is likewise accorded to the fact that the vehicle was registered out

of Lubbock. Lubbock is not such a hotbed of criminal activity that the Court finds that a car registered to an owner in Lubbock should raise suspicions. Furthermore, the vehicle was registered to a female with an Hispanic name. The passenger in Defendant's vehicle was a female of Hispanic descent, so the officers could have reasonably concluded that she was the named owner of the vehicle.

 Several aspects of Defendant's vehicle contributed to the Agents' suspicion. Specifically, the two antennas on top of the cab, the dark tinting of the windows, and the religious decals displayed on the back of the Suburban all alerted the Agents to the possibility of criminal activity. Agent Tashman testified that antennas are often used by smugglers traveling in a "lead-load" configuration. The Court accords some weight to the antennas, but because there was no evidence of a lead-load configuration, does not grant them heavy weight. Both Agents' suspicions were raised by their inability to see into the back of the vehicle, due to tinted windows. Agent Graham testified that the tinting appeared darker than most vehicles he had seen. Tinted windows protect the interior of a vehicle and its occupants from the damaging effects of intense sunlight and are therefore popular in West Texas. The Fifth Circuit concluded that darkly tinted windows may be a factor supporting reasonable suspicion, but only where they are of "extreme darkness." *United States v. Villalobos*, 161 F.3d 285 (5th Cir.1998). After hearing the credible testimony of the Agents and viewing pictures of the vehicle, the Court finds that the tinting on the Suburban, while dark, was not "extreme" and therefore accords no weight to this factor.

The Agents testified that they have been trained to regard vehicles displaying religious decals and symbols with suspicion, as such decals are used by smugglers who masquerade as God-fearing Christians. While running the registration on the Suburban, the Agents noticed three religious decals on the back of the truck: a fish symbol, a Virgin Mary decal, and a decal bearing a religious phrase. The use of religious artifacts as a basis for reasonable suspicion raises troubling questions for the Court. The fish symbol and other religious decals are omnipresent in West Texas. While Defendant and his companion are living proof that these symbols of devotion are subject to hypocritical use as a decoy to mask criminal activity, they are popular among individuals with a sincere desire to proclaim their faith. For reasons discussed below, the Court finds that the display of religious indicia can only be considered if other factors warranting a stop are strong. In this case, the Court accords this factor little weight.

## C. Religious decals and symbols as a basis for reasonable suspicion

The Border Patrol agents testified that the display of religious decals on Defendant's vehicle contributed to their suspicion that Defendant was involved in illegal activity and was a major factor relied upon in stopping Defendant. Where, as here, the display of religious decals is given as one factor contributing to the formation of reasonable suspicion to make a roving patrol stop, the stop may violate the Fourth Amendment and the First Amendment. Such a stop may also violate the Religious Freedom Restoration Act as it applies to the federal government.

### 1. Constitutional concerns

Reliance upon the display of religious symbols and decals implicates constitutional considerations under the Fourth and First Amendments.

### a. Fourth Amendment

 The Fourth Amendment applies to all seizures of a person, including a brief detention by a Border Patrol officer prior to a traditional arrest. *See Brignoni–Ponce*, 422 U.S. at 878, 95 S.Ct. 2574. Roving Border Patrol stops must be based on reasonable suspicion, formed by an

awareness of "specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." *See id.* at 884, 95 S.Ct. 2574. This mandate applies with equal force when officers make a stop based upon the suspicion that a vehicle contains illegal drugs. *See United States v. Cortez,* 449 U.S. 411, 421–22, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). In considering the constitutionality of a roving patrol stop, courts must strike a "delicate balance" between the "important constitutional considerations" implicated by roving patrol stops and the "pressing public concerns" over controlling drug smuggling. *U.S. v. Nichols,* 142 F.3d 857, 862 (5th Cir.1998). The *Brignoni–Ponce* factors provide a guidepost to courts trying to strike that balance. Where, as here, a roving patrol stop is based in part on a factor implicating important constitutional rights, it is the duty of the court to carefully evaluate the constitutionality of the factor before according it any weight. Here, the Court must determine whether reliance on the display of religious decals and symbols as a basis of suspicion treads impermissibly on the constitutional right of all citizens to be free from unreasonable searches and seizures.

The Court is guided by case law delineating the extent to which race may be used as a factor justifying a stop. *Brignoni–Ponce* involved a stop based solely on the apparent Mexican ancestry of a vehicle's occupants. *See Brignoni–Ponce,* 422 U.S. at 886, 95 S.Ct. 2574. There, the Court found that, while the appearance of Mexican ancestry is relevant and may be one of several factors justifying a stop, it cannot alone provide reasonable suspicion necessary to make a stop. *See id.* at 886–87, 95 S.Ct. 2574. Because the officers relied solely on race, the Court concluded that the stop constituted an unreasonable search and seizure in violation of the Fourth Amendment. *See id.* at 874, 95 S.Ct. 2574. In determining that apparent ancestry or race can contribute to reason-

able suspicion, the Court noted that "[t]he likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor." *Id.* Thus, the Court determined that reasonable suspicion may be formed in part by the appearance of the occupants of the vehicle, including, if relevant, the apparent race or ethnicity of the occupants. Other factors must also be present to legitimate reliance upon race.

Another factor enumerated by the *Brignoni–Ponce* Court as suitable for consideration is the appearance of the vehicle. This Court is faced with the novel question of whether Border Patrol agents may rely upon the vehicular display of religious decals as a factor supporting reasonable suspicion and justifying a stop. Reliance upon a person's professed religious beliefs as a basis for justifying a stop is troubling. The extent to which such reliance may tread impermissibly on free speech and free exercise rights under the First Amendment is discussed below. Here, the Court addresses the extent to which it may violate the Fourth Amendment.

As *Brignoni–Ponce* teaches, it is not permissible to abrogate the Fourth Amendment rights of citizens solely because of their ethnicity. Likewise, neither should it be permissible to abrogate the same rights of citizens solely because of their display of religious symbols. Despite the facts of this case, as a general rule, there is little reason to assume, without more evidence, that drug smuggling is connected with religious displays on vehicles, especially in West Texas where such displays are exceedingly popular. It is for a reason that this part of the nation is called the "Bible Belt." Consequently, the Court cautions the Border Patrol that reliance upon the display of religious decals and symbols as an affirmative factor in making a stop will not alone justify the stop. Nor will it justify a stop where, as here, other factors supporting a stop are weak.

██ Religious decals may be acknowledged as contributing to the suspicious appearance of a vehicle, but they are not alone suspicious. In addition, where such decals do contribute to the suspicious appearance of a vehicle, other factors contributing to reasonable suspicion must be strong. As an overall mandate, it is therefore the Court's view that, while religious symbols on vehicles cannot shield such vehicles from a reasonable suspicion inquiry, neither can religious symbols alone (or even together with other inconsequential factors) be employed to justify a reasonable suspicion stop.

In this case, the Agents testified that the display of religious symbols on the back of Defendant's Suburban was one of the main factors they relied upon in making the stop. Agent Tashman testified that his suspicion was based upon the training he had received, instructing that smugglers often use religious decals as decoys to mask their criminal activity. The Court does not doubt the existence of drug smugglers who will abuse religious symbols to mask their own criminal activity. Such use is hypocritical and abhorrent to the Court. Nor does the Court doubt the veracity of the testimony of Agent Tashman and Agent Graham; both officers testified in a straightforward, credible manner. The Court finds, however, that other factors relied upon in making the stop in this case were weak and therefore accords the vehicle's display of religious symbols no weight.

### b. First Amendment

Reliance on the display of religious decals and symbols also implicates the Free Speech and Free Exercise Clauses of the First Amendment.

### i. Free speech

██ The First Amendment protects private, religious speech. *See Widmar v. Vincent,* 454 U.S. 263, 269, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). "Speech" encompasses verbal and written expression, as well as "symbolic speech" expressed through symbols and conduct. *See Tinker v. Des Moines Independent School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). "Symbolic speech" is protected under the First Amendment if (1) the "speaker" intends to convey a message, and (2) there is a "great likelihood" that observers will understand the message. *See Spence v. Washington,* 418 U.S. 405, 410–11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). The vehicular display of religious decals and symbols is a form of "symbolic speech."

██ The regulation of symbolic religious speech has been considered most often in the context of schools. In *Chalifoux v. New Caney Independent School District,* a school regulation prohibiting the wearing of rosaries as necklaces was challenged as a violation of the First Amendment right to free speech and free exercise of religion. *See Chalifoux v. New Caney Independent School District,* 976 F.Supp. 659, 663 (S.D.Tex.1997). The school defended the regulation on the grounds that the wearing of rosaries was considered "gang-related apparel" and the prohibition was necessary to insure the safety of students. *See id.* at 663. The court concluded that the regulation violated the Free Speech Clause and the Free Exercise Clause.

In discussing the free speech claim, the court in *Chalifoux* referenced the *Tinker* case, in which the Supreme Court invalidated a regulation prohibiting the wearing of black armbands in protest of the Vietnam war. *See Tinker,* 393 U.S. at 508, 89 S.Ct. 733. In *Tinker,* the Court found that wearing black armbands was "akin to pure speech" and that a school may regulate pure speech only upon a showing that the speech causes a "substantial disruption of" or a "material interference with" school activities. *See id.* There must be clear evidence of the disruptive effect of the expressive speech; mere speculation will not support a regulation. *See id. See also Alabama & Coushatta Tribes v. Big*

*Sandy Independent School District*, 817 F.Supp. 1319, 1334 (E.D.Tex.1993) (holding speculation that long hair will lead to disruption in the school insufficient to overcome First Amendment challenges of Indian students).

In light of the authorities, it appears clear that the vehicular display of religious decals and symbols, like the wearing of a rosary, an armband, and long hair, is pure speech protected by the First Amendment Free Speech Clause. A governmental policy of detaining individuals on suspicion of criminal activity based solely on the exercise of such symbolic speech therefore violates the Free Speech Clause and cannot be implemented. The Border Patrol thus must proceed into this area with great care and caution, looking first to the *Brignoni–Ponce* factors to articulate the reasons for its stops.

### ii. Free exercise of religion

 "[O]ne of the most basic principles our Founders, recently freed from the oppression of European government, sought to establish through the Bill of Rights [was] the free exercise of religion as a fundamental right of the new American democracy." *Alabama & Coushatta Tribes*, 817 F.Supp. at 1332. The First Amendment protects the free exercise of religious beliefs. U.S. Const. amend. I. A regulation or policy that burdens a sincerely held religious belief violates the Free Exercise Clause, unless the government can demonstrate that the regulation advances an unusually important governmental goal, and that an exemption would substantially hinder fulfillment of the goal. *See Alabama & Coushatta Tribes*, 817 F.Supp. at 1319, 1330 (citing *Wisconsin v. Yoder*, 406 U.S. 205, 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)). Here, the governmental policy of targeting individuals who display religious decals on their vehicles threatens to burden the sincerely held beliefs of those who do so for the purpose of emphasizing their faith.

School regulations prohibiting religious symbolic speech have been challenged under the Free Exercise Clause as well as the Free Speech Clause. In *Alabama & Coushatta Tribes*, a regulation prohibiting the wearing of long hair by male students was challenged by a group of Indian students on the grounds that it violated their right to exercise or emphasize their religion. The Court found that, although long hair was not a tenet of their religion, but rather part of an effort to "return to their traditional culture and heritage," the regulation violated the Indian students' First Amendment right to freely exercise their religion. *Id.* at 1325.

Similar to the wearing of long hair and rosaries, the display of religious decals on a vehicle is protected by the First Amendment Free Exercise Clause as a means of emphasizing the faith of the owner. Even though the display of religious decals may not be a tenet of any religion, the right to emphasize one's religion by such a display cannot be burdened by a governmental policy of targeting individuals who choose to do so. The Border Patrol should be aware that targeting individuals for a display of religious decals on the sole basis of such a display violates the Free Exercise Clause of the First Amendment. Again, great caution is mandated, requiring the Border Patrol to look to *Brignoni–Ponce* factors as a first resort.

### 2. Religious Freedom Restoration Act

The Religious Freedom Restoration Act (RFRA) was enacted to restore the compelling interest test for adjudicating alleged violations of the First Amendment, after the Court refused to apply the test in upholding a state law criminalizing the use of peyote against a free exercise challenge. *See City of Boerne v. Flores*, 521 U.S. 507, 512–13, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) (discussing the impetus behind the enactment of RFRA—the Court's decision in *Employment Division v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876

(1990)). In *Boerne*, the Supreme Court declared RFRA unconstitutional. *See Boerne*, 521 U.S. at 536, 117 S.Ct. 2157.

It is unclear, however, whether the *Boerne* decision invalidated RFRA in its entirety, or whether it invalidated RFRA only in its application to state laws. *See* Edward J.W. Blatnik, *No RFRAF Allowed: the Status of the Religious Freedom Restoration Act's Federal Application in the Wake of City of Boerne v. Flores*, 98 Colum.L.Rev. 1410 (1998). Federal district and circuit courts are split as to whether RFRA was wholly or partially invalidated, with courts in the Fifth Circuit holding that the Court did not reach the question of the constitutionality of RFRA as it applies to the federal government. *See, e.g. Morehouse v. United States Department of Justice*, 1998 WL 320268, \*3 & n. 6 (N.D.Tex.1998) (noting that, in *Boerne*, the Court did not reach the question of RFRA's constitutionality as applied to the federal government). The Supreme Court itself has indicated that its decision in *Boerne* invalidated RFRA only in its application to the states. *See Florida Prepaid Postsecondary Education Expense Board v. College Savings Bank*, 527 U.S. 627, 119 S.Ct. 2199, 144 L.Ed.2d 575 (1999) (stating that in *Boerne*, "this Court held that [RFRA] exceeded Congress' authority under § 5 of the Fourteenth Amendment, insofar as RFRA was made applicable to the States.").

Assuming RFRA is still applicable to the federal government, where a federal regulation is shown to impose a substantial burden on the free exercise of religion, it will only be upheld if the government can demonstrate (1) a compelling reason for the regulation, and (2) the regulation is the least restrictive means of meeting the compelling need. 42 U.S.C. § 2000bb *et seq.* Therefore, a governmental policy that substantially burdens free exercise rights must be supported by a compelling reason and must be the least restrictive means of achieving the compelling objective.

▮ The goal of restraining the trafficking of illegal contraband on our nation's highways is certainly compelling. However, this Court believes that there are more restrictive methods of pursuing this goal than stopping vehicles displaying religious symbols, especially in an area where such symbols are as commonly displayed as they are in West Texas. The policy of targeting vehicles displaying religious symbols imposes a substantial burden upon the faithful who wish to proclaim their beliefs on the bumper of their car. Such a policy casts too wide a net, and the Court urges the Border Patrol to concentrate on other factors more strongly corroborative of criminal activity.

## CONCLUSION

The Court finds that the roving patrol stop of Defendant violated the Fourth Amendment. Although Border Patrol Agents Tashman and Graham testified credibly as to their attempt to conduct the stop in accordance with accepted constitutional standards, the absence of sufficiently reliable factors prevented the formation of reasonable suspicion to justify the stop. In addition, the Court cautions the Border Patrol that, in the absence of other sufficiently strong factors supporting a stop, reliance upon the vehicular display of religious decals and symbols as indicative of criminal activity likely violates the First and Fourth Amendments, as well as the Religious Freedom Restoration Act as it applies to the federal government. Accordingly,

Defendant's Motion to Suppress Evidence is hereby GRANTED.