UNITED STATES of America,
Plaintiff,

v.

Sylvester TOWNSEND,

and

David Green, Defendants.

No. CR-3-99-089 (1 & 2).

United States District Court,
S.D. Ohio,
Western Division.

Dec. 5, 2000.

David J. Horne, Washington, DC, for plaintiff.

Kevin M. Schad, Cincinnati, OH, Vincent P. Popp, Dayton, OH, John G. Bates, Chicago, IL, Lawrence J. Greger, for defendants.

DECISION AND ENTRY SUSTAINING MOTION OF DEFENDANT SYLVESTER TOWNSEND TO SUPPRESS EVIDENCE AND TO QUASH ARREST (DOC. #22); DECISION AND ENTRY SUSTAINING MOTION OF DEFENDANT DAVID GREEN TO SUPPRESS EVIDENCE (DOC. #23); CONFERENCE CALL SET

RICE, Chief Judge.

In the early morning hours of June 18, 1999, Defendants Sylvester Townsend ("Townsend") and David Green ("Green") were traveling east on Interstate 70 in a gold Acura Legend, when that vehicle was stopped for speeding by Troopers of the Ohio State Highway Patrol. Townsend was driving, while Green was riding in the front passenger's seat. Subsequently, that vehicle was searched, with the Troopers discovering $1,000 in allegedly counterfeit $100 bills.[1] As a result the Defendants have been charged in an Indictment (Doc. #14) with possessing counterfeit currency, in violation of 18 U.S.C. § 472.

This case is now before the Court on motions to suppress evidence filed by each Defendant. *See* Docs. #22 and #23. With those motions, the Defendants request that the Court suppress the counterfeit currency which was seized when the Acura Legend was searched.[2] This Court conducted an oral and evidentiary hearing on those motions on November 9 and 30, 1999, December 1, 1999, and March 24, 2000. In accordance with the briefing schedule established by the Court, the parties have filed their post-hearing memoranda. The Court begins its analysis by setting forth facts established concerning the stop of the Defendants' vehicle and its subsequent search.

At approximately 2:52 a.m., on the morning of June 18, 1999, the Defendants were traveling in a gold Acura Legend east on Interstate 70, approximately four miles east of the Ohio-Indiana border. At that time Troopers James Myers ("Myers"), Douglas Eck ("Eck") and John Chesser ("Chesser"), of the Ohio Highway Patrol, were parked on a cross-over in the median, with their cruisers facing south. Thus, the officers were looking directly at the eastbound traffic. Eck and Chesser were in one cruiser, with the latter driving and Eck acting as a "coach" for Chesser who was relatively inexperienced at that

---

1. An additional, allegedly counterfeit $100 bill was subsequently found on Green's person.

2. In addition, the Defendants have requested that the Court suppress their post-arrest statements. The Government has stipulated that those statements "were derived from the traffic stop and would not have been obtained without that stop." Transcript of November 30, 1999, Hearing (Doc. #32) at 5. The Defendants, in turn, agreed not to raise the issue of whether those statements were made in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Id.* Thus, pursuant to the fruit-of-the-poisonous-tree doctrine, whether the Defendants' statements must be suppressed is dependent upon whether their rights under the Fourth Amendment were violated during the traffic stop.

time.[3] Myers was in the other cruiser. As the Troopers were so parked, they observed the gold Acura Legend traveling at what appeared to be an excessive rate of speed. Using the laser, speed-measuring device in his cruiser, Myers was able to obtain a reading, indicating that the vehicle was being driven at 76 miles per hour. Myers testified that before using that device, he observed the Acura Legend slow down from a speed which he estimated to be in "the ultra high '80s, if not the low '90s." Transcript of November 9, 1999, hearing (Doc. #31) at 8. Eck and Chesser pursued that vehicle and pulled it over in the vicinity of mile-post 5 or 6.[4]

As Eck and Chesser were stopping the Acura Legend, they learned through their computer that the vehicle had not been reported stolen and that there were no outstanding warrants on that vehicle. When the two Troopers approached the automobile, Townsend raised his hands.[5] Chesser explained to Townsend that he had been stopped, because his vehicle had been "clocked" at 76 miles per hour. Consistent with Myers' observations, Townsend volunteered that he had been traveling at 85 miles per hour. Townsend also gave the Troopers his drivers license and proof of insurance. While that interaction was going on, Green sat in the passenger's seat, looking straight ahead. Although the owner of the car was not present, his name matched that on the proof of insurance furnished by Townsend. Eck then began to question Townsend about the purpose of his trip. Townsend explained that he and Green were traveling from Chicago to Columbus, to visit some sisters. Townsend also told Eck that he did not know the sisters' address, but that he planned to call them when he arrived. Examining the interior of the Acura Legend, Eck noted that it was unkempt and that it had a very messy, lived in appearance, with food wrappers and clothing strewn about. Eck also observed three cellular telephones, a bible and a road atlas in the interior of the automobile.

Based upon his observations, Eck testified that he had become suspicious that the Defendants may have been engaged in criminal activity. He and Chesser returned to their cruiser at approximately 2:56 a.m., about four minutes after the initial stop.[6] Eck told Chesser that they should investigate his observations a little further and requested that Myers come to the location of the traffic stop. Eck also obtained a criminal history on Townsend, learning that he had a previous weapons charge and that his driver's license was valid.[7] As Eck and Chesser were sitting in their cruiser, the former noted that the Defendants were constantly turning around to look at the

---

3. On June 18, 1999, Chesser had been employed by the Ohio State Highway Patrol for eight months, the first six of which had been spent in training.

4. There was no evidence that Townsend and Green attempted in any fashion to elude the Troopers or that they failed to pull to the side of the road promptly.

5. Townsend did not have anything in his hands.

6. Indeed, Eck testified that by 2:56 a.m. the Troopers had obtained all the information needed to issue a citation for speeding to Townsend. Although Chesser started writing the citation when he returned to his cruiser, it was not completed until after the Defendants had been arrested.

7. During the evidentiary hearing, Eck testified that he did not learn at the scene of the traffic stop whether Townsend had been convicted of a weapons offense or whether he had merely been charged with such an offense. In addition, Eck did not indicate when the offense had occurred. Approximately 30 minutes after the Acura Legend had been stopped, the Troopers obtained a criminal history on Green, learning that he had no record.

officers.[8] Eck testified that the Defendants' movements in that regard caused him to become fearful for his safety.[9]

When Myers arrived, he and Eck discussed what the latter had observed and had been told by Townsend.[10] Myers suggested that they remove the Defendants from their vehicle, frisk them and search the interior of the Acura Legend for weapons. The Troopers then asked the Defendants to exit from that vehicle, and Eck frisked them for weapons. Although no weapons were discovered, Eck testified that, when he frisked the Defendants, he felt what seemed to be wads of currency. Eck asked the Defendants about the seeming wads of currency, and they indicated that they did indeed have currency in their pockets. Thereafter, the Defendants were taken to the cruisers, with one Defendant being placed in each, after which the interior of the Acura Legend was searched for weapons. No weapons were discovered when the vehicle was so searched.

At that point. Myers and Eck decided to call for a drug detection dog to check the Acura Legend in order to ascertain whether it was being used to transport controlled substances. As a consequence, Trooper Charles Wright ("Wright") of the Ohio State Highway Patrol and his drug detection dog, Britt, were called to the location of the traffic stop. After Wright and his canine had arrived, the two walked around the Acura Legend. Britt scratched the rear of the vehicle, after which the Troopers searched it. In a compact disc changer, located in the trunk, 10 allegedly counterfeit $100 bills were discovered.

As can be seen from the foregoing explication of the circumstances giving rise to the instant motions seeking the suppression of evidence, the Defendants automobile was stopped, after which they were detained for a period and their Acura ultimately searched. During that search, counterfeit currency was discovered. Thus, in ruling upon the Defendants' motions requesting the suppression of that currency, the Court may be required to answer one or more or all of the following three questions, to wit: 1) did the initial stop of the Acura Legend violate the Fourth Amendment; 2) did the detention of the Defendants, between the time of the initial stop and the alert on that vehicle by Wright's drug-detection dog, violate that constitutional provision; and 3) was the Troopers' warrantless search of the interior of the Acura lawful under the Fourth Amendment? The Court will address those three questions in the above order. Of course, depending upon how the Court answers any one of those questions, it may not be necessary to answer the others.[11]

*I. Initial Stop*

 It cannot be questioned that stopping a vehicle constitutes a seizure

---

**8.** Although the Government characterizes the movements of the Defendants as "furtive," there is no evidence that they were in any manner attempting to hide anything or to secure a weapon. Rather, the Defendants merely turned around frequently to observe the two Troopers.

**9.** As is discussed below, Eck testified that he had initially become suspicious of Green, because he had acted too nonchalantly when the Troopers first approached the Acura Legend. Nevertheless, that Trooper also testified that the Defendants' actions of constantly turning around to observe the Troopers in their cruiser made him nervous.

**10.** Myers also asked Chesser "what do you have," to which the latter replied "nothing." Doc. #31 at 84.

**11.** Thus, for instance, if the Court were to decide that the initial stop violated the Fourth Amendment, it would be unnecessary to consider whether the Defendants' subsequent detention and the search of the Acura Legend likewise violated that constitutional amendment.

under the Fourth Amendment. *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir.2000). Therein, the Sixth Circuit reiterated that " 'so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful.' " *Id.* (quoting *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir.1993) (*en banc*), *cert. denied*, 513 U.S. 828, 115 S.Ct. 97, 130 L.Ed.2d 47 (1994)). Probable cause has been defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Padro*, 52 F.3d 120, 122-23 (6th Cir.1995). It is well-settled that the legality of a traffic stop is not dependent upon an officer's motivations. *See Whren v. United States*, 517 U.S. 806, 812-13, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("Subjective intentions play no role in ordinary, probable cause Fourth Amendment analysis."); *Ferguson*, 8 F.3d at 391. In other words, an officer with probable cause to believe that the driver of an automobile has committed a traffic offense may stop that vehicle, even though that seizure is a pretext for investigating other suspected criminal activity. Under the law of Ohio, it is unlawful to drive a vehicle on an interstate highway at a speed which exceeds 65 miles per hour. *See* Ohio Rev. Code § 4511.21(B)(12).

Herein, the officers noticed the Acura Legend traveling at what appeared to be an excessive rate of speed. Myers then used the laser, speed-measuring device located in his cruiser to obtain a reading showing that the Defendants' vehicle was being driven at 76 miles per hour. Unquestionably, that reading established probable cause to believe that Townsend was driving the Acura Legend at a rate of speed which was in violation of § 4511.21(B)(12). Since the officers had probable cause to believe that such a violation was occurring, the Court concludes that the initial stop of the Acura Legend did not violate the Fourth Amendment.

## II. Detention

An ordinary traffic stop is analogous to a seizure under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). *See Berkemer v. McCarty*, 468 U.S. 420, 438, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir.1996). Herein, the Court has concluded that the initial stop of the Acura Legend did not violate the Fourth Amendment; therefore, the Court focuses at this point on the Defendants' detention after that stop. In *Palomino*, the Sixth Circuit indicated that, even if the initial stop was lawful, any subsequent detention must not be excessively intrusive. *Id.* Put differently, once the purpose of the traffic stop has been completed, a motorist cannot be further detained unless something that occurred during the stop generated a reasonable and articulable suspicion of illegal activity. *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir.1995). *See also, United States v. Hill*, 195 F.3d 258, 264 (6th Cir.1999) ("Reasonable police conduct under such circumstances is such that any subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference.... Once the purpose of the traffic stop is completed, a motorist cannot be further detained unless something that occurred during the stop caused the officer to have a reasonable and articulable suspicion that criminal activity was afoot."), *cert. denied*, 528 U.S. 1176, 120 S.Ct. 1207, 145 L.Ed.2d 1110 (2000). The Government has the burden of proving by the preponderance of the evidence the existence of a reasonable suspicion, based upon objective and articulable facts, to believe that the Defendants were en-

gaged in criminal activity. *See e. g., United States v. Rivas,* 157 F.3d 364, 367 (5th Cir.1998); *United States v. Shareef,* 100 F.3d 1491, 1500-01 (10th Cir.1996); *United States v. Winfrey,* 915 F.2d 212, 216 (6th Cir.1990), *cert. denied,* 498 U.S. 1039, 111 S.Ct. 709, 112 L.Ed.2d 698 (1991); *United States v. Longmire,* 761 F.2d 411, 417-8 (7th Cir.1985).

As an initial matter, it should be noted that the Government does not contend that the Defendants were detained in order to complete the purpose of the initial traffic stop (i.e., to give a speeding ticket to Townsend). Indeed, such an argument would have been fruitless. Although Townsend had not been issued a citation before Britt alerted on the Acura Legend, the evidence establishes that, from the very beginning of the traffic stop, the officers were interested in developing a legal justification for searching the Acura Legend, rather than in giving Townsend a traffic ticket for speeding and allowing the Defendants to proceed with their journey. Eck testified during the November 30, 1999, oral and evidentiary hearing that certain actions of the Defendants after their vehicle had been stopped caused him to suspect that they were engaged in criminal activity, and candidly admitted that the Defendants were detained so that he could investigate his suspicions. *See* Doc. #32 at 96-97. The Government does argue, however, that Eck's observations, both what he had seen and what he had been told by

Townsend, gave the Troopers a reasonable suspicion, based upon articulable and objective facts, that the Defendants were engaging in criminal activity and that, therefore, they were justified in continuing to detain the Defendants until the arrival of Wright and his canine. For reasons which follow, the Court concludes that the Troopers' did not have such a reasonable suspicion. On the contrary, this Court finds that the officers merely relied upon innocuous actions by the Defendants, in an effort to detain them, in the hope that something would occur which would provide probable cause to search the vehicle. Consequently, the Court concludes that the continued detention of the Defendants, beyond the time that was necessary to issue a speeding ticket to Townsend, was unlawful. Accordingly, the evidence seized from the Acura Legend and the Defendants themselves must be suppressed.[12] *See Hill,* 195 F.3d at 264 (noting that evidence must be suppressed, if the defendant's detention, following a traffic stop, violates the Fourth Amendment).

In *Houston v. Clark County Sheriff Deputy,* 174 F.3d 809 (6th Cir.1999), the Sixth Circuit reviewed the standards which are applicable to determine whether a seizure or detention is permissible under *Terry:*

Police may briefly stop an individual for investigation if they have a "reasonable suspicion" that the individual has committed a crime. *United States v. Pal-*

---

**12.** In addition, in accordance with the fruit-of-the-poisonous-tree doctrine, the Defendants' statements must also be suppressed. *See Murray v. United States,* 487 U.S. 533, 536–37, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988) (noting that the doctrine "prohibits the introduction of derivative evidence, both tangible and testimonial, which is the product of the primary [illegally obtained] evidence"). *See also, Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Of course, that doctrine does not require the suppression of evidence, if the Government proves that the evidence was or would have been discovered through sources " 'wholly independent of any constitutional violation.' " *United States v. Dice,* 200 F.3d 978, 984 (6th Cir.2000) (quoting *United States v. Leake,* 95 F.3d 409 (6th Cir.1996)). Herein, given the Government's stipulation that the statements were derived from the traffic stop and that they would not have occurred without it, this exception to the fruit-of-the-poisonous-tree doctrine is inapplicable.

*omino,* 100 F.3d 446, 449 (6th Cir. 1996).... "Reasonable suspicion" is more than an ill-defined hunch; it must be based upon "a particularized and objective basis for suspecting the particular person ... of criminal activity." *United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). It requires "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant" an investigatory stop. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *United States v. Erwin,* 155 F.3d 818, 822 (6th Cir.1998), *cert. denied,* 525 U.S. 1123, 119 S.Ct. 906, 142 L.Ed.2d 904 (1999). The standard outlined in *Terry* and its progeny is not onerous. The requisite level of suspicion "is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989); *McPherson v. Kelsey,* 125 F.3d 989, 993 (6th Cir.1997), *cert. denied,* 523 U.S. 1050, 118 S.Ct. 1370, 140 L.Ed.2d 518 (1998). Moreover, reasonable suspicion can arise from evidence that is less reliable than what might be required to show probable cause. *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990); *McPherson,* 125 F.3d at 993.

*Id.* at 813. With those standards in mind, the Court turns to the factors which the Government contends established reasonable suspicion to justify the continued detention of the Defendants.

Eck testified that his suspicions were aroused from the inception of the stop by the fact that Townsend raised his hands when the officers approached the Acura Legend. Eck characterized that behavior as being unusual. However, he also testified that Townsend's actions were helpful, since they showed that he did not have a weapon in his hands. Doc. #32 at 43. The Court accepts that individuals stopped for traffic offenses do not normally raise their hands when officers approach their vehicle. Nevertheless, this Court cannot find that Townsend's behavior in that regard established reasonable suspicion to believe that the Defendants were engaged in criminal activity. Eck did not attempt to link Townsend's unusual, yet helpful behavior, to instances from his personal experiences or training, where a motorist, who raised his hands when officers approached his automobile, had been involved in criminal activity. It bears emphasis that the Defendants, two African-Americans, had been stopped by two white officers of the Ohio Highway Patrol on a rural interstate highway at three o'clock in the morning. In the absence of testimony from Eck, indicating that other motorists, who had been stopped for traffic offenses and who had raised their hands, were engaging in criminal activity, this Court cannot find that Townsend's act of raising his hands constituted reasonable suspicion that the Defendants were engaging in such activity.

■ Eck also testified that Green's demeanor during the initial confrontation made him suspicious that the Defendants were engaged in criminal activity. Eck described Green as being both nonchalant and very, very nervous. In the absence of an explanation by that Trooper as to how someone could exhibit an attitude of nonchalance, while at the same time acting nervous, this Court is unable to credit Eck's testimony in that regard.

In addition, Eck testified that he became suspicious of the Defendants, as a result of Townsend having stated, in response to being told that he had been clocked at 76 miles per hour, that he had been driving at the rate of 85 miles per hour. According to Eck, people stopped for speeding normally lie about the speed at which they had been

driving, a type of behavior which he does not find to be an indicator of criminal behavior. Eck testified that Townsend, on the other hand, was being overly cooperative, thus demonstrating a desire on his part to end the confrontation with the officers as quickly as possible. Eck testified that people who want to terminate a traffic stop oftentimes have something to hide. Quite simply, this Court cannot credit Eck's testimony in that regard. It defies credulity to believe that anyone stopped by a police officer on an Interstate highway, at 3:00 a.m., would want to do anything other than to end the stop as quickly as possible, so that he or she could continue on his or her journey.[13]

In response to Eck's query as to the purpose of his trip, Townsend stated that he and Green were traveling from Chicago to Columbus in order to visit some sisters. In addition, Townsend told Eck that he did not know the sisters' address, but that he planned to call them when he got to Columbus. Townsend's explanation of his travel plans caused Eck to become suspicious that the Defendants were engaged in criminal activity, because, according to his testimony, Chicago is a source city for the distribution of controlled substances, while Columbus is a destination city. Eck also found it unbelievable that the Defendants would be traveling to Columbus, without knowing the address of those they intended to visit. Turning first to Eck's description of Chicago as a source city for controlled substances, in *United States v. Beck*, 140 F.3d 1129 (8th Cir.1998), the Eighth Circuit rejected the argument that officers had reasonable suspicion that the defendant was engaged in criminal activity, because he was traveling from California, which, according to the officers, was a source state for controlled substances. The *Beck* court noted that law enforcement officials have identified a number of states and cities as the source of controlled substances:

A review of case law reveals that law enforcement officers have not only purported to identify a number of supply states, but also a significant number of the largest cities in the United States as "drug source cities." *See Reid v. Georgia,* 448 U.S. 438, 440, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (agent identified Fort Lauderdale as drug source city); *United States v. Scarborough,* 128 F.3d 1373, 1378 (10th Cir.1997) (Colorado deemed to be a "narcotics source state"); *United States v. Dennis,* 115 F.3d 524, 538 n. 4 (7th Cir.1997) (postal inspector identified as drug source states "the entire West Coast" as well as Texas, Florida, Arizona, and parts of Washington); *United States v. Jerez,* 108 F.3d 684, 686 (7th Cir.1997) (law enforcement officer identified Texas, Florida, Arizona and California as drug source states); *United States v. Polk,* 97 F.3d 1096, 1097 (8th Cir.1996) (identifying Los Angeles as a source city); *United States v. Underwood,* 97 F.3d 1453, 1996 WL 536796, *3 (6th Cir.1996) (noting in unpublished table decision that Long Beach was a drug source city), *cert. denied,* 519 U.S. 1100, 117 S.Ct. 787, 136 L.Ed.2d 729 (1997); *United States v. Burgos,* 94 F.3d 849, 868 (4th Cir.1996) (acknowledging that New York City is a source city for con-

---

**13.** Moreover, this Court cannot accept Eck's premise that, since the normal reaction by individuals stopped for speeding is to attempt to lie about the speed at which they were driving, the fact that a citizen truthfully volunteers incriminating information is somehow indicative that he is engaging in criminal activity. While it may well be that the motoring public has a propensity to lie to law enforcement officials about the speed at which they had been traveling, Eck presented absolutely no evidence that those who tell the truth are more likely to commit crimes than their prevaricating brethren.

traband drugs), *cert. denied,* 519 U.S. 1151, 117 S.Ct. 1087, 137 L.Ed.2d 221 (1997); *United States v. Fletcher,* 91 F.3d 48, 50 (8th Cir.1996) (identifying Phoenix as drug source city), *cert. denied,* 520 U.S. 1121, 117 S.Ct. 1258, 137 L.Ed.2d 338 (1997); *United States v. McNeil,* 4 F.3d 987, 1993 WL 347524, *1 (4th Cir.1993) (recognizing New Jersey as drug source state in an unpublished table decision), *cert. denied,* 510 U.S. 1135, 114 S.Ct. 1111, 127 L.Ed.2d 422 (1994); *United States v. Odum,* 72 F.3d 1279, 1282 (7th Cir.1995) (identifying Houston as source city); *United States v. Johnson,* 64 F.3d 1120, 1125 (8th Cir. 1995) (noting that Chicago was a source city), *cert. denied,* 516 U.S. 1139, 116 S.Ct. 971, 133 L.Ed.2d 891 (1996); *[United States v.] White,* 42 F.3d [457, 460 (8th Cir. 1994)] (identifying El Paso and Albuquerque as drug source cities); *United States v. McMurray,* 34 F.3d 1405, 1409 (8th Cir.1994) (characterizing Oakland, California, and Portland, Oregon as drug source cities), *cert. denied,* 513 U.S. 1179, 115 S.Ct. 1164, 130 L.Ed.2d 1119 (1995); *United States v. O'Neal,* 17 F.3d 239, 241 n. 3 (8th Cir. 1994) (pointing out that Miami is deemed to be drug source city), *cert. denied,* 513 U.S. 960, 115 S.Ct. 418, 130 L.Ed.2d 333 (1994); *United States v. Respress,* 9 F.3d 483, 487 (6th Cir.1993) (recognizing Ontario, California, as drug source city); *United States v. Fifty-Three Thousand Eighty-Two Dollars in U.S. Currency, $53,082.00,* 985 F.2d 245, 247 (6th Cir.1993) (characterizing Dallas as a drug source city); *United States v. Jennings,* 985 F.2d 562, 1993 WL 5927, *1 (6th Cir.1993) (denoting in unpub-

lished table decision that Newark is a drug source city); *United States v. Ushery,* 968 F.2d 575, 579 (6th Cir.) (identifying San Francisco as a drug source city), *cert. denied,* 506 U.S. 946, 113 S.Ct. 392, 121 L.Ed.2d 301 (1992); *United States v. Galvan,* 953 F.2d 1098, 1102 (8th Cir.1992) (labeling San Diego as a drug source city); *United States v. Flowers,* 912 F.2d 707, 708 (4th Cir.1990) (identifying Detroit as a drug source city), *cert. denied,* 501 U.S. 1253, 111 S.Ct. 2895, 115 L.Ed.2d 1060 (1991).

*Id.* at 1138 n. 3. Given that so many areas of this nation have been identified as being the source of controlled substances, this Court cannot find that Eck's conclusory testimony, identifying Chicago as one of those locations, equates to reasonable suspicion that the Defendants were engaged in criminal activity. With respect to the alleged lack of credulity concerning the Defendants' travel plans (i.e., that Townsend did not know the sisters' address), the Sixth Circuit has indicated that lying to police about origin and purpose of trip is not by itself incriminating. *United States v. Avery,* 137 F.3d 343, 350 (6th Cir.1997). Herein, there is no indication that Townsend lied to Eck about his travel plans; rather, that officer merely concluded that they were not credible. Therefore, this Court cannot find that Townsend's statement that he did not know the sisters' address gave the officers a reasonable suspicion to believe that the Defendants were engaged in criminal activity.

While he was initially at the Defendants' automobile, Eck observed three cellular telephones and a Bible, which he described as indicators of criminal activity.[14] With respect to the cellular telephones, in *Unit-*

---

**14.** Eck also testified that he had seen a road atlas in the Acura Legend, which raised his suspicions that the Defendants were engaged in criminal activity. Eck's testimony that the road atlas is an indicator of drug trafficking is not credible. *See United States v. Wood,* 106 F.3d 942, 947 (10th Cir.1997) (noting that an open map is "is entirely consistent with innocent travel").

ed States v. Romy, 1997 WL 1048901 (E.D.N.Y.1997), the District Court rejected the Government's argument that a police officer's observation of a number of cellular telephones in the defendant's home established either probable cause or a reasonable suspicion to believe that the defendant was engaged in criminal activity, writing:

> In addition, the observation of a cellular phone in Romy's hand and two or three other phones on the bar did not authorize the agents' conduct. Given the wide current availability of cellular phones, I reject the argument that the mere possession of cellular phones provides probable cause to believe Romy had committed a crime or even reasonable suspicion that he might have. To conclude otherwise would be to ignore the ubiquity of cellular phones in our society.

See also, United States v. Garcia, 52 F.Supp.2d 1239, 1252 (D.Kan.1999) (noting that cellular telephones are legally possessed and used by a wide segment of the population and that, therefore, the defendant's possession of such a means of communication added little to the calculus of reasonable suspicion, despite the fact that the Tenth Circuit had indicated in 1992 that cellular telephones are recognized tools of the drug trade). This Court agrees with the sentiments expressed in those decisions. Although cellular telephones may once have been considered to be tools of the drug trade, their use is now far too common to find that even the presence of multiple such devices in an automobile gives rise to a reasonable suspicion that the occupants of that vehicle have been engaged in criminal activity.

With respect to the presence of the Bible in the Acura Legend, Eck testified that individuals who are engaging in criminal activity will sometimes display Bibles or religious symbols in their automobiles, as a decoy in order to mask their criminal activity. He did not, however, quantify the percentage of individuals who travel with a Bible or display a religious symbol in their automobiles who are actually engaging in criminal activity. In *United States v. Ramon,* 86 F. Supp.2d 665 (W.D.Tex.2000), the court addressed an analogous situation. Therein, United States Border Patrol agents were standing next to their vehicle near a Border Patrol checkpoint on Highway U.S. 385, approximately 65-70 miles north of the closest point on the United States border with Mexico. The agents knew that criminals used that road to smuggle controlled substances and illegal aliens from Mexico to the United States. The agents observed a vehicle being driven north on U.S. 385. At that point, the checkpoint was not operating, because a shift change had just occurred. The agents were aware that smugglers frequently attempted to pass the checkpoint near the time of a shift change, because it would not be operating at that time. The agents also noticed that the vehicle was equipped with two antennas, which they associated with smuggling, and noted that it was not one of the many vehicles driven by local residents which they were able to recognize. Based upon those observations, the officers decided to pursue the vehicle. When they caught up to it, they saw three religious decals on the rear of the vehicle. Relying primarily upon the religious decals, the agents stopped the vehicle. Subsequently, a drug detection dog alerted on the vehicle, and it was searched, as a result of which a quantity of marijuana was seized. As a result, the defendant, who had been driving, was prosecuted. He moved to suppress the evidence seized from the vehicle, arguing that the stop had violated the Fourth Amendment. The Government argued that the stop was lawful under that Amendment, because the agents had reasonable suspicion that the defendant was

engaged in criminal activity. During the suppression hearing, the agents testified that they had been taught during training that smugglers often displayed religious symbols on their vehicles in order to deflect suspicion. The District Court concluded that the stop had violated the Fourth Amendment, writing that, "while religious symbols on vehicles cannot shield such vehicles from a reasonable suspicion inquiry, neither can religious symbols alone (or even together with other inconsequential factors) be employed to justify a reasonable suspicion stop." *Id.* at 675. This Court concurs with the analysis and result reached in *Ramon,* and, therefore, concludes that the presence of the Bible in the front seat of the Defendants' Acura Legend did not justify their detention beyond the time that was necessary to issue a traffic ticket to Townsend.

Thus, none of Eck's observations which he had made when he was initially at the Acura Legend, considered individually or in tandem, justified the detention of the Defendants beyond the time necessary to issue a traffic ticket to Townsend.

■ After the initial confrontation at that vehicle, Eck and Chesser returned to

their cruiser. While Eck was ascertaining whether Townsend had a criminal record,[15] he saw the Defendants constantly turning around to look at the officers, activity which caused Eck to become fearful for his safety. At about that time, Myers arrived at the location of the stop and conferred with Eck. The two Troopers decided on removing the Defendants from their vehicle, as well as on frisking them and conducting a protective search of the passenger compartment in order to discover weapons. As a result, the Defendants were told to get out of the Acura Legend. Eck then frisked the Defendants and felt what he perceived to be a wad of currency in each Defendant's pants pocket.[16] The Defendants confirmed to Eck that they indeed did have currency in their pockets. At that point, the Defendants were placed in the rear seat of the two police cruisers, one in each, and the Troopers conducted a protective sweep of the interior of the Acura Legend, with no weapons being found.[17] Despite the fact that no weapons were found on the Defendants or in the passenger compartment of their vehicle and, thus, that they did not pose a danger to the officers, Wright and

---

**15.** Eck testified that he learned Townsend had previously been arrested on a weapons offense. However, Eck also indicated that he did not learn, during the traffic stop, whether Townsend had been convicted of that charge.

**16.** When an automobile has been stopped for violating a traffic ordinance, the Fourth Amendment permits a police officer to order the driver of or a passenger in that vehicle to exit it, regardless of whether the officer has a basis for believing that the occupants of the vehicle are armed or are engaging in criminal activity. *See Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (passengers); *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (driver). Despite having the authority to order an individual to exit a vehicle, an officer cannot frisk that individual, unless he has reason-

able suspicion to believe that the individual is armed. Herein, since the Defendants do not argue that they were unlawfully frisked, this Court does not address that issue.

**17.** In *Michigan v.. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Supreme Court held that police may conduct a protective search of an automobile during a traffic stop, "when police have a reasonable belief that the suspect poses a danger...." *Id.* at 1049, 103 S.Ct. 3469. Herein, since no incriminating evidence was discovered during the protective sweep of the Acura Legend (as opposed to its subsequent search when allegedly counterfeit currency was found), it is not necessary to decide whether that protective sweep was permissible under *Long,* i.e., whether the officers had a reasonable belief that the Defendants posed a danger to them.

his drug detection dog were asked to come to the location of the traffic stop, in order to determine whether the Defendants were transporting controlled substances.

As can be seen, the officers had acquired two additional pieces of information, which, according to the Government, contributed to the existence of reasonable suspicion, to wit: the Defendants' constant turning in their seats to observe Eck and Chesser as they sat in their cruiser and the fact that each of the Defendants had some amount of currency in one of the pockets of his trousers. The Court addresses those two pieces of information in the above order.

With respect to the constant moving of the Defendants, this Court cannot find that it established or even contributed to the existence of reasonable suspicion that the Defendants were engaging in criminal activity. Eck did not describe the Defendants' actions in sufficient detail to permit this Court to find that they were attempting to hide contraband or to obtain a previously hidden weapon. Rather, from the Troopers' testimony, the Court finds that the Defendants merely turned around constantly to observe Eck and Chesser as they sat in their cruiser. Although Eck testified that he found that behavior to be an indicator that the Defendants were engaging in criminal behavior, he did not explain why that was so; rather, his testimony in that regard was conclusory. In *United States v. Montero-Camargo*, 208 F.3d 1122, 1136 (9th Cir.2000) (*en banc*), the Ninth Circuit rejected the argument that the failure of the passenger in the car being driven by the defendant to make eye contact with a police officer contributed to the existence of reasonable suspicion to believe that she and the defendant were engaged in criminal activity. In particular, the Ninth Circuit rejected reliance upon that factor, because the officer might have found it equally suspicious if the passenger

had paid too much attention to the officers and, thus, it was a case of "damned if you do, equally damned if you don't." *Id.* Herein, Eck's testimony points out that potential problem. The Trooper testified that he became suspicious when he first approached the Acura Legend, because Green did not pay sufficient attention to him. However, Eck became even more suspicious, when the Defendants later paid too much attention to him. It is possible that the Defendants' behavior as Eck and Chesser sat in their cruiser demonstrated nervousness. However, this Court cannot find that acting nervous after having been stopped by police officers contributes to the existence of reasonable suspicion. The Sixth Circuit has indicated that nervousness is insufficient to establish reasonable suspicion. *Mesa*, 62 F.3d at 162. *See also, United States v. Wood*, 106 F.3d 942, 947 (10th Cir.1997) ("It is certainly not uncommon for most citizens--whether innocent or guilty--to exhibit signs of nervousness when confronted by a law enforcement officer.").

With respect to the currency, Eck testified that an individual's possession of a large amount of currency is an indicator that he is engaging in the distribution of controlled substances, which Eck described as a cash business. This Court accepts that an individual's possession of a large amount of currency could establish reasonable suspicion to believe that he is engaging in criminal activity. However, in the present case, there is insufficient evidence for this Court to find that the Defendants possessed currency in sufficient amount for Eck to have had a reasonable suspicion, based upon objective and articulable facts, that the Defendants were engaging in the distribution of controlled substances. For instance, although Eck testified that each of the Defendants' had a sizeable wad or roll of currency, the Government has not presented evidence as to the amount of currency and the number of

bills each of the Defendants was carrying.[18] In the absence of such evidence, this Court cannot find the fact that each of the Defendants had a wad of currency in his trousers pocket established reasonable suspicion to believe that they were engaged in criminal activity.

In sum, the Court cannot find that the factors relied upon by the Government, considered individually or together, established reasonable suspicion to believe that the Defendants were engaging in criminal behavior.[19] Rather, the officers have merely attempted to characterize innocent behavior as giving rise to their suspicion in order to justify the continued detention of the Defendants, after the time necessary for a traffic ticket to be issued to Townsend. Accordingly, the Court, having concluded that the Defendants were detained for an excessive length of time, sustains their motions seeking the suppression of evidence. As a result, none of physical evidence seized from the Defendants or their post-arrest statements will be admissible in the trial of this prosecution.

Counsel listed below will take note that the Court has scheduled a telephone conference call on Thursday, December 14, 2000, at 8:45 a.m., for the purpose of discussing procedures leading to the conclusion of this prosecution. Prior to said conference, counsel for the Government must consider and notify the Court whether sufficient evidence remains to proceed with the prosecution of this litigation. If this question is answered in the negative, there will be no need for this conference call to take place.

---

18. The Defendants were searched after having been arrested. Presumably, officers removed the currency from the Defendants' pockets and inventoried it.

19. Given that conclusion, it is not necessary to address the question of whether the officers had probable cause to search the Acura Legend.