UNITED STATES of America,

v.

John IRIZARRY.

No. 07–CR–313 (JBW).

United States District Court, E.D. New York.

Aug. 30, 2007.

Tanisha Simon, U.S. Attorneys Office, Brooklyn, NY, for United States of America.

## MEMORANDUM & ORDER

WEINSTEIN, Senior District Judge.

### I. *Introduction*

Defendant moves to suppress a handgun seized at the time of his arrest. Suppression is required because the arresting officer seized him without reasonable suspicion of criminal activity and arrested him without probable cause. He was stopped because a police officer observed clipped to his jeans an instrument supplied by his employer for cutting and installing sheet rock. It is used by thousands of other workers in the carpet, sheet rock, window screen and other trades. To deny suppression would transform thousands of honest mechanics into criminals, subject to arrest at the whim of any police officer.

### II. *Facts*

On March 9, 2007, at approximately 11:55 a.m., New York City Police Department (NYPD) officer Brendan R. McCabe, a 16–year veteran of the force, was on foot patrol in uniform at the Broadway Junction subway station in Brooklyn, New York. He observed defendant walk past him in the station with an instrument jutting out of his right front pocket. *See* Photograph 1, below.

Officer McCabe testified that he recognized the instrument to be a cutting tool in the form of a gravity knife. (Tr. June at 36). He stopped defendant and said, "you know you're not allowed to carry that knife." (*Id.* at 5, 11).

The defendant immediately informed the officer that he was employed at a U–Haul facility and that he used the instrument for cutting sheet rock as directed by his employer. (*Id.* at 17). Officer McCabe then asked him for identification, which was immediately supplied.

Defendant was arrested. The officer searched him and recovered a loaded pistol from his jacket pocket. (*Id.* at 10). There had been no reason to believe defendant had the gun until he was searched.

Defendant testified that he purchased the tool two years ago using a U–Haul credit card that was given to him by his employer to buy supplies and tools. He had not altered the instrument in any way.

(*Id.* at 30). The instrument was a Husky Sure–Grip Folding Knife ("Husky"), described on its packaging as a "Folding Lock–Back Utility Knife". *See* Photograph 2, below.

2

The instrument is colored silver, about three and one half inches long when in its closed position, and about 6 inches in its open position, with a one inch cutting edge. (Tr. June at 7–8); *see also* Photographs 3 and 4, below.

3

Derek Mobley, an assistant store manager for Home Depot (a major national retail distributor of tools and supplies with a listing on the New York Stock Exchange), the company which sells the tool, testified. He is familiar with, and has received training from Home Depot on, all products that are sold in his department, including the Husky. Mr. Mobley stated that the instrument is sold to contractors for such things as cutting sheet rock, carpeting and window screens. (Tr. August at 8).

The Husky is a top selling product at Home Depot. (*Id.* at 9). Its New York State stores sold 67,341 Huskies in fiscal

year 2006 for a total of $587,540.00; from January 2007 through July 2007 it has sold 36,441 Huskies for $294,116.00. *See* Court Exhibit 6.

James Furgal, was qualified as an expert in the area of cutting instrument design. (Tr. August at 19). He has had his own large factory for the production of knives, scissors and other tools. (*Id.* at 17–18). He has served as president of a national association of such manufacturers. (*Id.* at 18–19). He testified that Husky is a home Depot brand; that identical or nearly identical instruments are sold under a variety of brand names, including Sheffield; and they are sold by other major retailers. (Tr. August at 22–23). The manufacturer of the instrument sold under the Sheffield brand name indicated in a letter submitted to the court that it sold 1,765,091 similar folding lock-back utility knives nationally in 2006. *See* Court Exhibit 7.

Defendant's Husky is capable of being opened by an adept person with the use of sufficient centrifugal force. Officer McCabe demonstrated this after three strenuous attempts to open the Husky using one hand and centrifugal force. (Tr. June at 19). He had seen knives which opened more readily through the use of such force. (*Id.* at 18). Mr. Mobley testified that he was trained by Home Depot that the Husky should be opened with two hands. (Tr. August at 8).

According to Mr. Furgal, the term gravity knife has referred to a knife that has a lever or button that releases a lock so that the blade can be released by force of gravity or centrifugal force. The gravity knife was originally designed for use by paratroopers in World War II in case they become injured during a jump and needed to extricate themselves from their parachutes; gravity knives enabled them to open the knife with one free hand. American paratroopers were provided the equivalent, a switchblade. (*Id.* at 27). He noted that a folding lock-back utility cutting instrument such as the Husky is designed so that it can be opened with one hand or two. For two-handed operation there is a trigger at the back of the instrument that should be depressed with one hand, and the other hand should then be used to pull the instrument open. (*Id.* at 8). For one handed operation the instrument includes an opening stud at the base of the blade so that a person can open the instrument with one hand using the thumb. *Id.; see* Photograph 5, below.

The Husky, he declared, is not designed to open by use of centrifugal force; it is constructed so that it has a bias to close in order to ensure safety when the instrument is not in use. It is possible that such an instrument could be opened by sufficient centrifugal force because if there was too much resistance, or "bias" toward closing, the instrument could not be opened with one hand. (*Id.* at 21).

## III. *Law*

### A. *Criminal Possession of a Weapon: N.Y. Penal Law §§ 265.00–265.01*

New York Penal Law section 265.01, Criminal Possession of a Weapon in the Fourth Degree, covers gravity knives, the term the government contends covers the cutting instrument defendant was carrying. It reads:

a person is guilty of criminal possession of a weapon in the fourth degree when he possesses any firearm, electronic dart gun, electronic stun gun, *gravity knife*, switchblade knife, pilum ballistic knife, metal knuckle knife, cane sword, billy, blackjack, bludgeon, metal knuckles, chuka stick, sand bag, sandclub, wristbrace type slingshot or slungshot, shirken or "Kung Fu star."

*Emphasis added.*

■ Section 265.00 defines a gravity knife as "any knife which has a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force which, when released, is locked in place by means of a button, spring, lever or other device." "Centrifugal Force" is "the apparent force that is felt by an object moving in a curved path that acts outwardly away from the center of rotation." *Merriam–Webster's Collegiate Dictionary* (11th ed.2005).

### B. *Legislative History of the New York Gravity Knife Law*

In 1909, the New York State legislature revised the Penal Code to create a comprehensive body of laws which comprised the new penal law. It sought to disarm criminals as a primary means of crime prevention, defining a handful of items as "per se" weapons. Under section 1897 of the 1909 New York Penal Law the legislature declared carrying a "slungshot, billy, sandclub or metal knuckles" a felony without requiring any criminal intent on the part of the individual in possession of the item. New York State Statutes, Article 172 § 1897 (1909). By 1930, the list of "per se" weapons included the possession of "a blackjack, slungshot, billy, sand club, sandbag, metal knuckles and bludgeon." New York State Statutes, Article 172, § 1897(1) (1930). Possession of a variety of knives under this same provision was only crimi-

nalized if possessed with the intent to use them unlawfully. *Id.*

In 1954 New York made selling or possessing a "switchblade" a misdemeanor. A switchblade was defined as "any knife which has a blade which opens automatically by hand pressure applied to a button, spring or other device in the handle of the knife. . . ." Act of Mar. 26, 1954, ch. 268, 1954 N.Y. Laws. An exception was carved out of the statute: possession of a switchblade knife was lawful if it was necessary for "purposes of business, trade or profession, or for use while hunting, trapping and fishing," with a license. *Id.* Governor Thomas Dewey's memorandum on the bill justified the law stating, "[l]ast year there were 4,420 felonious assaults and 99 homicides reported in New York City in which knives were used. Analysis indicates that over one-third of these crimes involved the use of switchblade knives." New York State Legislative Annual, p. 385 (1954). Two years later the law was amended, making it unlawful to possess a switchblade even if it was necessary for the possessor's employment. New York State Legislative Annual, p. 21 (1956). The legislative commentary explained that although the 1954 statute "has not been without effect, enforcement is made difficult by" the professional provision, and the defense "goes far towards vitiating the statute." *Id.* The bill passed because of the "continued hazard" that switchblade knives presented, and the view that they served no "legitimate and necessary purpose." *Id.* at 22.

Following the passage of the switchblade law, judges and law enforcement officials in New York City began seeing other limitations to the effectiveness of the law. The "gravity knife," a slightly different weapon, was dubbed a "legal" successor to the switchblade, since it contained the same basic characteristics as the

switchblade, yet it circumvented the law because of the manner in which the blade was deployed. Emma Harrison, *Group Seeks Ban on Gravity Knife*, N.Y. Times (Dec. 19, 1957). The gravity knife, seen as the "new tool for teenage crime," was cheap and accessible all across the city, and according to Ralph Whelan, the executive director of the Youth Board, was used in "many of the most vicious crimes by young people." *Id.* New York Supreme Court Justice John E. Cone, chairman of the Committee to Ban Teenage Weapons, reported that youth taunted police officers across the city with the gravity knife, knowing that the law did not condemn their conduct. *Id.* Judge Cone's committee vowed to take action to criminalize the possession of the gravity knife in New York State as well as to propose a federal law criminalizing the manufacture and importation of switchblade and gravity knives. *Id.*

Before any legislative action was taken, the New York Court of Special Sessions ruled "that gravity knives were in the same category as switchblade knives, and their sale or possession was a violation of the ... Law," identifying "per se" weapons. *Court Bans Sales of Gravity Knives*, N.Y. Times (Feb. 6, 1958).

In 1958, the New York City Council adopted a resolution asking the state legislature to specifically ban gravity knives. Proceedings of the Council of the City of New York, Vol. 1, Res. No. 8 (Feb. 18 1958). The resolution stated that a state ban of gravity knives is a "crying need" in New York City, and that manufacture and sale of such knives to teenagers "increases crime and juvenile delinquency." *Id.*

The New York State legislature quickly reacted by banning the sale and possession of gravity knives. Act of Mar. 5, 1958, ch. 107, 1958 N.Y. Laws (Dangerous Weapons—Gravity Knives—Sale or Possession).

Gravity knives were defined, as they are today, as "any knife which has a blade which is released from the handle or sheath thereof by the force of gravity or the application of centrifugal force and which, when released, is locked in place by means of a button, spring, lever, or other device...." *Id.* A supporting memorandum for the law from the superintendent of the New York State Troopers stated that the bill "deals with a technicality concerning a type of dangerous weapon and clarifies and reinforces existing law." Letter from Francis S. McGarvey, Superintendent of New York State Troopers, to Hon. Daniel Gutman, Council to the Governor, Executive Chamber (Feb. 26, 1958), NYLS' Governor's Bill Jacket, 1958, p. 4, Chapter 107. The NYPD also supported the bill:

> The experience of this Department indicates that gravity knives are being used increasingly as weapons in the perpetration of such crimes as homicide, assault, rape and robbery.... [S]ince it is not unlawful to possess such a knife under present law, ... one of the deterrent factors in the prevention of serious crime is lost.
>
> ... The gravity knife is inherently dangerous.

Bill Jacket, pp. 15–16.

The federal government followed suit shortly thereafter enacting its own switchblade law in 1958 that defines gravity knives and switchblades in the same way. It provides, "[w]hoever knowingly introduces, or manufactures for introduction, into interstate commerce, or transports or distributes in interstate commerce, any switchblade knife, shall be fined not more than $2,000 or imprisoned not more than five years, or both." Switchblade Knife Act, Pub.L. No. 85–623, § 2, 72 Stat. 562 (1958) (codified at 15 U.S.C. §§ 1241–44). It defines a switchblade knife as, "any

knife having a blade which opens automatically—(1) by hand pressure applied to a button or other device in the handle of the knife or (2) by operation of inertia, gravity, or both." *Id.* The Senate report supporting the bill states:

Of the robberies committed in 1956, 43.2 percent were by person under 21 years of age. A switchblade knife is frequently part of the perpetrator's equipment in this type of crime. In New York City alone in 1956, there was an increase of 92.1 percent of those under 16 arrested for the possession of dangerous weapons, one of the most common of which is the switchblade knife.

. . . .

... The switchblade knife is, by design and use, almost exclusively the weapon of the thug and the delinquent. Such knives are not particularly adapted to the requirements of the hunter or fisherman, and sportsmen generally do not employ them. It was testified that, practically speaking, there is no legitimate use for the switchblade to which a conventional sheath or jackknife is not better suited.

S.Rep. No. 85–1980 (1958) *reprinted in* 1958 U.S.C.C.A.N. 3435, 3437.

### C. *Terry v. Ohio*

 Under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion ... that criminal activity 'may be afoot,' even if the officer lacks probable cause." *U.S. v. Swindle,* 407 F.3d 562, 566 (2d Cir.2005) (internal citations omitted). A Terry stop allows police to pursue a limited investigation when they lack information necessary to establish probable cause to arrest. *Adams v. Williams,* 407 U.S. 143, 145–46, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or hunch." *U.S. v. Elmore,* 482 F.3d 172, 178 (2d Cir.2007) (citations omitted). "[T]he police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry v. Ohio,* 392 U.S. at 21, 88 S.Ct. 1868. "Like probable cause, reasonable suspicion is determined based on the totality of the circumstances." *U.S. v. Elmore,* 482 F.3d at 179. "In determining whether [an] officer acted reasonably in such circumstances due weight must be given ... to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience." *Terry v. Ohio,* 392 U.S. at 27, 88 S.Ct. 1868.

### D. *Probable Cause to Arrest*

 Law enforcement officers possess probable cause to arrest when at the moment of arrest, "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information [are] sufficient to warrant a prudent [person] in believing that the [defendant] had committed or was committing an offense." *Beck v. Ohio,* 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964); see also *United States v. Patrick,* 899 F.2d 169, 171 (2d Cir.1990) ("[p]robable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested"). "Probable cause is a fluid concept-turning on the assessment of probabilities in particular factual contexts." *United States v. Cruz,* 834 F.2d 47, 50–51 (2d Cir.1987). The concept concerns " 'the factual and practical considerations of everyday life on which reasonable and prudent men, not

legal technicians, act.'" *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (citations omitted).

■ The widespread and lawful presence of an item in society undercuts the reasonableness of an officer's belief that it represents contraband. *See U.S. v. Romy,* 1997 WL 1048901 at *8 (E.D.N.Y.1997) ("I reject the argument that the mere possession of cellular phones provides probable cause to believe Romy had committed a crime or even reasonable suspicion that he might have. To conclude otherwise would be to ignore the ubiquity of cellular phones in our society"); *United States v. Townsend,* 138 F.Supp.2d 968, 977 (S.D.Ohio 2000) (same); *United States v. Ho,* 94 F.3d 932 (5th Cir.1996) (finding recovery of white plastic swipe cards with magnetic strips on back did not create probable cause to believe defendant possessed fraudulent credit cards because of prevalence of such cards).

IV. Application

A. *Terry v. Ohio*

[7] Determining whether officer McCabe had reasonable suspicion to stop defendant requires consideration of the specific reasonable inferences which he was entitled to draw from the facts. The officer seized defendant based solely on seeing a metal clip protruding from his pocket. (Tr. June at 5). What the officer observed might have represented many innocuous objects. On cross examination officer McCabe conceded that he is "familiar with other tools such as ... a tape measure that sometimes comes with a clip similar to the clip that's on the back" of defendant's Husky. (Tr. June at 21).

When asked what made him think the object clipped to defendant's pocket was a gravity knife, officer McCabe responded that he has recovered weapons with the "same clip, same head of the knife," "same color." It was reasonable for the officer to conclude, based on his experience, that defendant was carrying a Husky. But carrying a Husky was not a crime or a suspicious act.

In fiscal year 2006 Home Depot alone sold over 67,000 Huskies in the State of New York. Credible testimony supports the conclusion that nearly identical instruments are distributed under various brand names by other major retailers. (Tr. August at 23). The prevalence of this instrument and its everyday use by law abiding mechanics makes unreasonable any inference of illegal activity drawn merely from the observation of such an instrument clipped in an individual's pocket.

Carrying a Husky is not a suspicious act that alone gives rise to reasonable suspicion of criminal activity. The instrument which defendant had in his possession is a common tool. Its open possession is the equivalent of a carpenter carrying a hammer or an individual in the street carrying a cellular phone. The law cannot define as criminals tens of thousands of mechanics who are required to carry such tools in order to earn a living. Claw hammers, used by carpenters, can be used to smash skulls, screwdrivers, used by electricians, can be used to stab bodies and wall board cutters can be used to cut jugular veins, but those are not the intended or designed for uses of such instruments.

The legislature's plan in making items such as gravity knives "per se" weapons under New York law was to ban only those items that are manufactured as weapons, not to criminalize the carrying of utility cutting instruments which are widely and lawfully sold.

B. *Probable Cause to Arrest*

■ Even if Officer McCabe had reasonable suspicion to initially stop defen-

dant, which he did not, there was no probable cause to arrest him. The Husky which was recovered is not a gravity knife and officer McCabe could not have reasonably believed it to be one. It is designed, sold and used as a folding knife. Although the officer was ultimately able to open the Husky with centrifugal force at the hearing, it was obviously not designed to be opened in this fashion and does not readily open through such force. (*See* Tr. June at 18–19). The defendant's expert, as well as a representative of the retailer, each testified that the Husky was not intended to be opened with centrifugal force and was not treated as a weapon by its designer, manufacturer, seller, or users.

The history of the gravity knife provision as well as the legislative scheme distinguishing "dangerous instruments" from "per se" weapons demonstrates a plan only to ban those items designed to be used as weapons. An examination of the other items on the banned list underscores this point.

Support for this conclusion lies in the initial exemption in the New York law for the carrying of switch blades for professional or trade purposes. The fact that the exemption was later abolished when it was determined that switchblades have no legitimate purpose demonstrates that New York banned only those items which are manufactured as weapons.

Even if Officer McCabe believed the Husky to be a gravity knife, his belief was not reasonable given the instrument's wide and routine distribution for lawful purposes. With so many folding lock-back utility knives in circulation for lawful purposes, nationally and within the State of New York, it was not reasonable for the arresting officer to believe that the Husky represented a weapon. The possession of a Husky by the defendant, an employed mechanic who used the instrument in his work at his employer's direction, did not provide probable cause to believe that he committed or was about to commit a crime.

### V. *Conclusion*

Defendant's motion to suppress is granted.

SO ORDERED.