**UNITED STATES of America,**
**Plaintiff,**

v.

**Hermerejildo MAGANA, Jr., Defendant.**

**No. SA–07–CR–470–RF.**

United States District Court,
W.D. Texas,
San Antonio Division.

March 13, 2008.

Charlie Strauss, Assistant United States Attorney, San Antonio, TX, for Plaintiff.

Adam L. Kobs, Law Office of Adam Kobs, San Antonio, TX, for Defendant.

**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS**

ROYAL FURGESON, District Judge.

This case addresses the question of whether the religious provisions of the First Amendment can curtail the authority of law enforcement to stop and search vehicles. The question is raised by Defendant's Motion to Suppress (Docket No. 15), filed October 10, 2007. The Government filed its Response (Docket No. 18) October 22, 2007. On December 7, 2007, this Court held a hearing on this matter. During the hearing, the Court gave an oral ruling, that after carefully considering the facts of the case, the briefing, evidence, and applicable law, the Motion to Suppress should be GRANTED. The Court now memorializes its oral ruling in this Order.

## I. Introduction

This routine traffic stop case implicates the First and Fourth Amendments. It involves an officer who initiated a traffic stop after observing what he believed to be a defective tire. After verifying the tire was not in fact defective, the officer detained the driver, because among other things, the driver had a religious statue on his dashboard. The officer stated that in his experience and opinion, religious symbols are used to dispel suspicion of wrongdoing and are usually indicative of drug activity. The Court finds that religious symbols cannot be used to generate reasonable suspicion of drug dealing or criminality. To do so, violates religious rights secured by the First Amendment and consequently, the Fourth Amendment. After removing the impermissible element of the religious symbol from the officer's reasonable suspicion calculation, the Court finds the remaining factors do not rise to the level of warranting extending the detention. Because reasonable suspicion did not exist to extend the stop, once the officer realized a violation had not been committed, the purpose of the stop was fulfilled, and anything thereafter controverted Defendant's Fourth Amendment rights.

Therefore, the Court grants Defendant's Motion to Suppress.

## II. Factual and Procedural Background

On the morning of July 25, 2007, Trooper Michael A. Turk ("Trooper Turk") and Gonzales County Sheriff's Deputy Floyd Toliver ("Deputy Toliver") were each parked in the median part of a turn around off IH–10 in Gonzales County. Tr. at 21; *Govt's Proposed Findings of Fact*, (Docket No. 26) at 1. Trooper Turk observed a white 2001 Chevrolet Cavalier traveling eastbound on IH–10 that appeared to have a defective left rear tire. *Id;* Tr. at 5. Trooper Turk thought "[t]he tire was wobbling" and "[i]t could become defective." Tr. at 5, 6. Trooper Turk radioed in stating it "it looks like the left rear tire has a knot or something ... it looks defective ... [I'm] going to stop it and have a conversation ... don't know if the axle is bent." Ex. 1 (Video). As a result, Trooper Turk pursued the vehicle, activated his emergency lights, and conducted a traffic stop for the perceived violation.[1] Tr. at 6; *Govt's Proposed Findings of Fact*, at 1. As he exited his patrol car and approached the driver's side window of the vehicle, the video tape of this incident shows that Trooper Turk glanced at what he originally perceived to be a defective left tire. Ex. 1. He also noticed a black leather jacket, embroidered with the words "US Air Force" in the back seat. Tr. at 8; *Govt's Proposed Findings of Fact*, at 2.

Trooper Turk identified himself and advised the driver, Defendant Hermerejildo Magana, Jr. ("Magana") of the purpose of the traffic stop. Tr. at 9; *Govt's Proposed Findings of Fact*, at 2. Immediately, Magana advised Trooper Turk the tire was not defective, but that the rim was simply bent. *Id.; Ex.* 1. Magana handed Trooper Turk his Texas driver's license, which identified him as Hermerejildo Magana, Jr., and his insurance. *Id.* As Magana was handing over his license and insurance, Trooper Turk noticed he was nervous.[2] *Id.* After a few routine questions, Trooper Turk questioned Magana about the leather jacket, and Magana responded that he had it because it was raining in Laredo. Tr. at 12.

At this point, Trooper Turk observed the passenger compartment of the vehicle, and noticed a religious statue on the dash, and an air freshener hanging from the rearview mirror.[3] Tr. at 13; *Govt's Proposed Findings of Fact*, at 3. Trooper Turk testified that from his experience "in previous drug seizures we have noticed that there's been religious symbols in vehicles when we've seized drugs from them." Tr. at 14. Trooper Turk testified that religious symbols are possibly indicators, along with other things, that increase his suspicion of drug trafficking. *Id.* He stated he considered the presence of a religious symbol as part of the "totality of the circumstances" when developing his suspicion about possible criminal activity. *Id.*

Trooper Turk requested that Magana exit the vehicle, and instructed him to wait behind the vehicle while he inspected the left rear tire. *Id.* at 15. Tropper Turk informed Magana that from the highway he could not tell if the tire was damaged, to which Magana again replied that the rim was bent. Ex. 1. Trooper Turk concluded the tire was okay, and the rim of

---

1. As Trooper Turk pursued Magana on the highway, the on-board video camera was activated.

2. Trooper Turk testified that Magana's hand was trembling.

3. Affixed to the dash was a religious statue of the Virgin Mary, or Our Lady of the Guadalupe.

the wheel was indeed bent as Magana had previously stated. *Id.* at 17. Therefore, Magana did not commit a traffic violation.[4] Tr. at 17. Despite this fact, Trooper Turk detained Magana on the side of the road and continued to question him because he was suspicious of possible criminal activity.[5] *Id.* at 18. Trooper Turk asked questions about where Magana was going, where he worked, and how much money he was carrying. Ex. 1. Magana responded to all of the questions and informed Trooper Turk he had about one hundred dollars.[6] *Id.* Trooper Turk asked Magana several times why he was so nervous. *Id.* Magana repeatedly responded that he was not nervous, and ultimately stated that had never been stopped before. *Id.* Trooper Turk asked Magana if he was carrying anything illegal in his vehicle, such as marijuana, cocaine, or other drugs. Tr. at 18–19. Magana responded he was not, and that Trooper Turk could go ahead and search the vehicle. *Id.* at 19. At no point did Trooper Turk give Magana any indication he was free to leave.

While Magana was detained on the side of the highway, Trooper Turk returned to his patrol car with Magana's license and radioed dispatch for a criminal-history check. Ex. 1; Tr. at 19; *Govt's Resp. to Def.'s Mot. to Suppress* (Docket No. 18), at 4. He also requested another unit to assist him, and Deputy Toliver responded he was in route. *Id.* Trooper Turk then asked

Magana for the specific address of his mother's house in Houston, which is where Magana was traveling. Ex. 1. He also asked Magana for consent to search his vehicle. Tr. at 19. After patting down Magana, and receiving consent, Trooper Turk searched the vehicle for fourteen minutes. *Id.* at 20; *Govt's Resp. to Def.'s Mot. to Suppress,* at 3. Trooper Turk began to search the trunk of the car and Magana's bag.[7] Ex. 1. Eventually, Deputy Toliver arrived and assisted him. Tr. at 21. While looking under the hood, Trooper Turk and Deputy Toliver noticed post-factory alteration of bolts, which contained tool marks. *Id.* at 20–21. They loosened the bolts, pulled the fender back, and noticed a trap door. *Id.* at 22. They opened the trap door and noticed black bundles in the compartment. *Id.* After observing the black bundles, the officers placed Magana under arrest. *Id.* Later testing of the substance in the bundles revealed multiple kilograms of heroin. *Id.* at 23.

Magana filed his motion to suppress arguing his constitutional rights were violated because the stop, and search and seizure of his person and vehicle were without articulable reasonable suspicion and probable cause. *Def.'s Mot. to Suppress* (Docket No. 15) at 1–2. The Government argues the initial stop was legal, and although the purpose of the initial stop was fulfilled when Trooper Turk de-

---

4. Trooper Turk testified that once he determined the tire was not defective, and it was only the rim that was bent, he knew in fact, that a violation had not occurred. *Id.* at 17–18.

5. The factors that led to Trooper Turk's suspicion were: the U.S. Air Force leather jacket in the back seat in July; the nervousness of Magana; the religious symbol on the dash and air freshener on the mirror—which Trooper Turk had observed in previous narcotics seizures; and the way Magana answered questions-responding to Trooper

Turk's questions before he finished asking them, as if Magana had rehearsed the answers. *Govt's Proposed Findings of Fact,* at 3.

6. Magana returned to his vehicle to retrieve his wallet to show Trooper Turk his money. Ex. 1.

7. Just after Trooper Turk initiated the search of the vehicle, dispatch can be heard returning the requested information, and shortly after Deputy Toliver arrived, all criminal history results were relayed. Ex. 1.

termined no violation had in fact occurred, articulable, reasonable suspicion existed to warrant extending the detention. *Govt's Resp. to Def.'s Mot. to Suppress,* at 8–9. For the reasons stated below, the Court finds Magana's First and Fourth Amendment rights were violated and therefore all of the evidence that resulted from the search and the illegal detention must be suppressed as "fruit from the poisonous tree."

Any finding of fact herein above which also constitutes a conclusion of law is adopted as a conclusion of law. Any conclusion of law herein made which also constitutes a finding of fact is hereby adopted as a finding of fact.

### III. Discussion

The Fourth Amendment protects individuals against unreasonable searches and seizures. U.S. CONST. amend. IV. The purpose of the "Fourth Amendment is to 'shield the citizen from unwarranted intrusions into his privacy.' " *United States v. Ramon,* 86 F.Supp.2d 665, 670 (W.D.Tex. 2000) (quoting *Jones v. United States,* 357 U.S. 493, 499, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958)). Because the warrant procedure is impractical in exigent circumstances, traffic stops are governed by the proscription against "unreasonable searches and seizures." *Terry v. Ohio,* 392 U.S. 1, 20, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). "Traffic stops are deemed seizures for the purposes of the Fourth Amendment." *United States v. Lopez–Moreno,* 420 F.3d 420, 430 (5th Cir.2005) *cert denied,* 546 U.S. 1222, 126 S.Ct. 1449, 164 L.Ed.2d 146 (2006); *United States v. Valadez,* 267 F.3d 395, 397 (5th Cir.2001).

As a result, courts analyze the legality of traffic stops under the standard articulated in *Terry v. Ohio,* which sets out a two-tiered "reasonable suspicion" inquiry. *Lopez–Moreno,* 420 F.3d at 430; *Valadez,* 267 F.3d at 398. Under the *Terry* standard, a court asks whether the officer's action was (1) justified at its inception; and (2) whether the search and seizure was reasonably related in scope to the circumstances that justified the stop in the first place. *Id.* (citing *Terry,* 392 U.S. at 19–20, 88 S.Ct. 1868). Furthermore, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer,* 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Unless there is additional articulable, reasonable suspicion, the detention must end once an officer's suspicion is verified or dispelled. *Valadez,* 267 F.3d at 398. "At that point, continuation of the detention is no longer supported by the facts that justified its initiation." *United States v. Shabazz,* 993 F.2d 431, 436 (5th Cir.1993).

### A. The First Prong of the *Terry* Test

■ To justify a traffic stop at its inception, "an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Lopez–Moreno,* 420 F.3d at 430 (citing *United States v. Breeland,* 53 F.3d 100, 102 (5th Cir.1995)).

An analysis of reasonableness is necessarily fact-specific, and "factors which by themselves may appear innocent, may in the aggregate rise to the level of reasonable suspicion." *United States v. Ibarra–Sanchez,* 199 F.3d 753, 759 (5th Cir.1999). The Fifth Circuit has stated that "reasonable suspicion exists when the officer can point to specific and articulable facts, which taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Lopez–Moreno,* 420 F.3d at 430; *United States v. Santiago,* 310 F.3d 336, 340 (5th Cir.2002). Courts look at the totality of the circum-

stances to discern whether an officer was faced with a "particularized and objective basis" for suspecting legal wrongdoing. *United States v. Arvizu,* 534 U.S. 266, 273, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

In the instant case, Magana argues the stop was unjustified at its inception because a traffic violation did not occur. In contrast, the Government contends Trooper Turk observed what he believed was a defective rear tire, which is a violation of the Texas Transportation Code. Specifically, the Government claims that while sitting on the side of the road, Trooper Turk observed that Magana's "tire was wobbling" and that "[i]t could become defective." Trooper Turk believed this to be a violation of Section 547.004 of the Texas Transportation Code, which states in part:

> § 547.004[0]. GENERAL OFFENSES, (a) A person commits an offense that is a misdemeanor if the person operates or moves or, as an owner, knowingly permits another to operate or move, a vehicle that:
>
> (1) is unsafe so as to endanger a person;
>
> (2) is not equipped in a manner that complies with the vehicle equipment standards and requirements established by this chapter; or
>
> (3) is equipped in a manner prohibited by this chapter.

■ An officer's "subjective motivations are irrelevant in determining whether his or her conduct violated the Fourth Amendment." *Lopez–Moreno,* 420 F.3d at 432; *Devenpeck v. Alford,* 543 U.S. 146, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). If the initial stop was justified, any subjective motivation for the stop, even if based on

race or ethnicity, is irrelevant. *Whren v. United States,* 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89(1996).

Furthermore, the primary law enforcement purposes for making a traffic stop are (1) to verify a violation of the traffic law has occurred, or is occurring; and (2) to issue the appropriate ticket or citation charging the traffic violation, or make an arrest of the driver based upon the violation. *Lopez–Moreno,* 420 F.3d at 430.

■ Turning to the instant case, the Court finds there was objectively reasonable suspicion to justify the stop. The Transportation Code makes it a violation to drive a vehicle that is unsafe to operate. Trooper Turk believed Magana's tire was wobbling, and therefore, was unsafe or becoming unsafe.[8] Tr. at 5, 6. His observation gave him reasonable suspicion that a Transportation Code violation was committed or about to be committed. *See Lopez–Moreno,* 420 at 430 (citing *Breeland,* 53 F.3d at 102). Substantiating Trooper Turk's perception is Magana's statement that the rim of the tire was bent. Thus, the Court finds Trooper Turk articulated specific facts supporting reasonable suspicion that Magana was violating § 547.004(a) of the Transportation Code. Therefore, the primary law enforcement purpose of investigating the possibly defective tire justified the initial detention and the Government has satisfied the first prong of the *Terry* stop analysis.

**B. The Second Prong of the *Terry* Test**

■ Even if the traffic stop is justified at its inception, the subsequent search and seizure must also be reasonably related in

---

**8.** Although the incident was recorded, the condition of the left rear tire cannot be clearly ascertained. At no time did trooper Turk mention in his testimony, his report, or through the Government, that Magana's tire appeared flat, was going flat, or was in fact flat. On the video, Trooper Turk indicated before he made the traffic stop that "it looks like the left rear tire has a knot or something ... it looks defective ... [I'm] going to stop it and have a conversation ... don't know if the axle is bent." Ex. 1.

scope to the circumstances that justified the stop in the first place. *Terry*, 392 U.S. at 19–20, 88 S.Ct. 1868. The detention of the individual must be "temporary and last no longer than is necessary to effectuate the purpose of the stop ...." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir.2004) (en banc). If additional reasonable suspicion arises in the course of the stop, and *before the initial purpose of the stop has been fulfilled*, the detention may continue until the officer confirms or dispels the new reasonable suspicion. *Brigham*, 382 F.3d at 507 (emphasis added).

Reasonableness is measured in objective terms by examining the totality of the circumstances. *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). Courts have consistently "eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry." *Id.* The Supreme Court expressly disavowed a litmus-paper test or single sentence rule, "in recognition of the 'endless variations in the facts and circumstances' implicating the Fourth Amendment." *Id.* (citing *Royer*, 460 U.S. at 500, 103 S.Ct. 1319).

In the instant case, the question before the Court is whether reasonable suspicion existed for Trooper Turk to extend the detention, once the purpose of the stop was fulfilled. Magana argues the purpose of the stop was fulfilled when Trooper Turk realized no violation had occurred. Magana further asserts there was not reasonable suspicion to extend the detention and any subsequent consent was invalid. The Government agrees the purpose of the stop was fulfilled when Trooper Turk realized no violation had occurred. However, in contrast, the Government also argues reasonable suspicion existed to extend the detention because there was a religious statue on the dashboard; Magana was nervous; there was a leather jacket on the

back seat with the words "US Air Force" emblazoned on the back; and there was an air freshener hanging from the rear view mirror.

Below, the Court analyzes the elements used in Trooper Turk's reasonable suspicion calculation to determine if reasonable suspicion existed. This is followed by a discussion of the point at which the purpose of the stop was fulfilled. The Court finds reasonable suspicion did not exist for Trooper Turk to extend the detention of Magana—thus rendering his detention unlawful after it was realized no violation occurred. Because reasonable suspicion did not exist to extend the stop, further detention after the purpose of the stop was resolved, was unlawful and contravened Magana's Fourth Amendment rights. Therefore, the evidence must be suppressed.

### 1. Reasonable Suspicion Calculation

#### a. The Religious Statue and First Amendment Implications

One of the factors considered by Trooper Turk in his reasonable suspicion calculation was the presence of a religious symbol. The Court finds this is an impermissible factor in the reasonable suspicion calculus because it violates the Free Speech and Free Exercise Clauses of the First Amendment.

■ The First Amendment protects private, religious speech. *See Widmar v. Vincent*, 454 U.S. 263, 269, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981). "Speech" encompasses verbal and written expression, as well as "symbolic speech" expressed through symbols and conduct. *See Tinker v. Des Moines Indep. Sch. Dist.*, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). "Symbolic speech" is protected under the First Amendment if (1) the "speaker" intends to convey a message; and (2) there

is a "great likelihood" that observers will understand the message. *See Spence v. Washington,* 418 U.S. 405, 410–11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974). Displaying religious decals and symbols on a vehicle is a form of symbolic speech.[9]

■ Because displaying a religious symbol on a vehicle constitutes symbolic speech, and is protected by the First Amendment's freedom of expression, it is impermissible for law enforcement to use religious paraphernalia in their reasonable suspicion calculation. *Ramon,* 86 F.Supp.2d at 665; *Estep v. Dallas County, Tex.,* 310 F.3d 353 (5th Cir.2002); *United States v. Townsend,* 305 F.3d 537 (6th Cir.2002); *United States v. Guerrero,* 472 F.3d 784 (10th Cir.2007).

Eight years ago, while sitting in the Pecos division, this Court addressed whether there were First and Fourth Amendment constitutional implications when law enforcement relies on religious symbols to establish reasonable suspicion. *See Ramon,* 86 F.Supp.2d at 674. Since this Court's ruling in *Ramon,* the Fifth, Sixth, and Tenth Circuits have discussed the First Amendment implications when law enforcement construes symbolic speech as an indication of criminal wrongdoing. Today, this Court revisits its ruling, and discusses the Fifth, Sixth, and Tenth Circuits' rulings below.

*United States v. Ramon*

In *United States v. Ramon,* this very Court found "that the display of religious indicia can only be considered if other factors warranting a stop are strong." 86 F.Supp.2d at 673. Further, the Court found that where the display of religious decals is given as one factor creating suspicion to make a roving patrol stop, the stop *may* violate the First and Fourth Amendments. *Id.* at 673. Today, the Court extends this ruling and finds the consideration of a religious symbol in a reasonable suspicion calculation, does in fact, violate the First and Fourth Amendments.

In *Ramon,* United States Border Patrol agents were standing next to their vehicles outside a border patrol checkpoint on Highway U.S. 385, roughly seventy miles from the Mexico border. *Id.* at 666–667. The agents observed a vehicle they did not recognize as belonging to local residents. *Id.* at 668. As the vehicle passed, the agents became suspicious because the occupants extended what the agents perceived as an overly-friendly greeting. *Id.* The vehicle had two non-factory installed antennas on it, which the agents associated with drug smuggling. *Ramon,* 86

---

9. The regulation of symbolic religious speech has been considered most often in the context of schools. In *Chalifoux v. New Caney Indep. Sch. Dist.,* a school regulation prohibiting the wearing of rosaries as necklaces was challenged as a violation of the First Amendment right to free speech and free exercise of religion. 976 F.Supp. 659, 663 (S.D.Tex.1997). The school defended the regulation on the grounds that the wearing of rosaries was considered "gang-related apparel" and the prohibition was necessary to insure the safety of students. *Id.* at 663. The court concluded that the regulation violated the Free Speech Clause and Free Exercise Clause. *Id.*

Additionally, the First Amendment protects the free exercise of religious beliefs. U.S. CONST. amend. I. A regulation or policy that burdens a sincerely held religious belief violates the Free Exercise Clause, unless the government can demonstrate the regulation advances an unusually important governmental goal, and that an exemption would substantially hinder fulfillment of the goal. *See Ala. & Coushatta Tribes v. Trustees of The Big Sandy Indep. Sch. Dist.,* 817 F.Supp. 1319, 1330 (E.D.Tex.1993) (citing *Wisconsin v. Yoder,* 406 U.S. 205, 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972)). The instant case implicates both the Free Speech Clause and the Free Exercise Clause of the First Amendment.

F.Supp.2d at 668. Furthermore, the agents noticed the rear windows appeared to be heavily tinted, which they perceived as a method to obscure the view into the vehicle to hide aliens or narcotics. *Id.* The agents decided to pursue. *Id.* When they caught up to the suspects, they saw three religious decals on the rear of the vehicle (a metallic fish symbol, a Virgin Mary sticker, and a religious phrase).[10] *Id.* at 669.

Relying primarily on the religious decals, the agents decided to stop the vehicle. *Id.* One of the agents exited his vehicle with his K9, who subsequently alerted, which resulted in a search of the vehicle and the seizure of marijuana. *Ramon,* 86 F.Supp.2d at 669. The driver was prosecuted and moved to suppress the evidence, arguing the stop violated his Fourth Amendment rights. *Id.* at 673. The Government argued the stop was lawful because the agents had reasonable suspicion to believe the defendant was engaging in criminal activity, due to the two antennas, the dark window tinting, and the religious decals. *Id.* at 665, 673.

In its analysis, the Court stated that any reliance on a person's professed religious beliefs as a basis for justifying a stop was troubling. *Id.* at 674. The Court further found that "in the absence of sufficiently strong factors supporting a stop, reliance upon the vehicular display of religious decals and symbols as indicative of criminal activity likely violates the First and Fourth Amendments ...." *Id.* at 677. The Court emphasized that "[e]ven though the display of religious decals may not be a tenet of any religion, the right to emphasize one's religion by such a display cannot be burdened by a governmental, policy of targeting individuals who choose to do so." *Ramon,* 86 F.Supp.2d at 676. The Court further warned that "targeting individuals for a display of religious decals on the sole basis of such a display, violates the Free Exercise Clause of the First Amendment." *Id.* The Court concluded that "while religious symbols on vehicles cannot shield such vehicles from a reasonable suspicion inquiry, neither can religious symbols alone (or even together with other inconsequential factors) be employed to justify a reasonable suspicion stop." *Id.* at 675.

In the instant case, the Court takes *Ramon* one step further and concludes that consideration of a religious symbol as a factor in the reasonable suspicion calculus of whether to extend a traffic stop violates the First and Fourth Amendments.[11] Therefore Trooper Turk's consideration of the Virgin Mary statue on the dashboard as an inference of criminal activity, which contributed to his reasonable suspicion calculus, is impermissible.

In addition to *Ramon,* the Court's conclusion today is supported by other rulings in the Fifth Circuit and other circuits, which all discuss hindrances on symbolic speech.

*Estep v. Dallas County, Tex.*

In *Estep,* the Fifth Circuit, citing *Ramon,* addressed First Amendment concerns when officers use an individual's

---

**10.** The agents testified that observing the religious symbols on the back of the defendant's suburban was one of the main factors they relied on in making the stop. *Id.* at 675. The agents testified that they had been trained to look for religious symbols because smugglers used them as decoys to mask criminal activity. *Id.* However, the agents also testified that these very same religious symbols were often displayed by individuals with sincere religious beliefs. *Id.*

**11.** In *Ramon,* the religious symbol was displayed on the bumper of a car and used to justify an investigatory detention. In the present case, the religious symbol was displayed on the dash and used to *extend* the detention.

protected right of expression to conjure up reasonable suspicion. 310 F.3d at 353. In *Estep*, the Fifth Circuit stated that the presence of a NRA sticker on a vehicle should not have raised the inference the driver was dangerous. *Id.* at 358. The Court concluded "[r]egardless of whether there is some correlation between the display of an NRA sticker and gun possession, placing an NRA sticker in one's vehicle is certainly legal and constitutes expression which is protected by the *First Amendment.* A police officer's inference that danger is afoot because a citizen displays an NRA sticker in his vehicle presents disturbing *First* and *Fourth Amendment* implications." *Id.* at 358–359 (emphasis in original).

The Fifth Circuit did not definitively decide whether displaying an NRA sticker could ever contribute to a "reasonable suspicion" of danger calculus. *Id.* at 359. However, it did find that the officer's "utilization of the NRA sticker in his 'reasonable suspicion' of danger calculus was unwarranted when viewing the facts in the light most favorable to [the defendant]." *Id.* The Court then analyzed the remaining factors that allegedly indicated to the officers they were in danger. *Estep*, 310 F.3d at 359. The Court noted there was no law that prevented a private citizen from carrying a camouflage jacket, a key chain with mace, or displaying an NRA sticker on his vehicle. *Id.* The Court opined that if the presence of an NRA sticker and a camouflage jacket in a vehicle could be used by an officer to conclude he was in danger, "half the pickups in the state of Texas would be subject to a vehicle search." *Id.* After acknowledging police officers have to make difficult split-second decisions, the Fifth Circuit noted that when reviewing reasonable searches the court "cannot rubber-stamp a search of a vehicle based on an officer's mere inchoate

and unparticularized 'hunch' that a citizen poses an immediate threat of danger." *Id.*

The same analysis in *Estep* applies to the case at bar and the Court refuses to "rubber-stamp" the search of the vehicle based on Trooper Turk's "mere inchoate and unparticularized hunch" that Magana engaged in criminal activity because he displayed a religious symbol on his dashboard. Therefore, the Court must remove this factor from the reasonable suspicion calculation in this case.

*United States v. Townsend*

The Court's decision today is also supported by rulings outside of this Circuit. For example, in *Townsend,* the Sixth Circuit agreed with this Court's ruling in *Ramon,* and held that having a Bible in the passenger compartment of a vehicle is a very weak indicator of criminal activity. 305 F.3d at 544. In *Townsend,* the officers initiated a traffic stop for a speeding violation. *Id.* at 539. Upon making the stop, the officers noticed odd behavior and found many things unusual that gave them reasonable suspicion to believe the individual was involved in drug trafficking. *Id.* The officers observed nervousness; the car was registered to someone not in the vehicle—later determined to be the defendant's mother; the defendant could not remember his sister's address where he was traveling to; and there were three cellular phones and a Bible in the passenger compartment. *Id.* at 540. Regarding the Bible in the passenger compartment, an officer testified that in his experience, drug couriers often prominently display religious symbols in their cars in order to deflect suspicion of drug smuggling. *Id.* He further testified "that individuals who are engaging in criminal activity will sometimes display Bibles or religious symbols in their automobiles, as a decoy in order to mask their criminal activity." *United*

*States v. Townsend,* 138 F.Supp.2d 968, 977 (S.D.Ohio 2000).

The Sixth Circuit observed that although the *Ramon* court did not hold that reliance on religious symbols was completely invalid, the court stated that it was a very weak indicator of criminal activity. The Sixth Circuit agreed with *Ramon* and stated that "having a Bible inside the car appears even further from a deliberate plan to throw police off the scent." *Townsend,* 305 F.3d at 544. The court agreed with the district court that the Bible was a very weak indicator of criminal activity. Ultimately, the court held that the factors pointed to by the government were relatively small and did not rise to the level of creating reasonable suspicion. *Id.* at 545.

*United States v. Guerrero*

Similarly, the Tenth Circuit also addressed this issue and held that it did not support law enforcement using religious symbols in a reasonable suspicion calculation to draw an inference of criminal wrongdoing. *Guerrero,* 472 F.3d at 788. In *Guerrero,* a Kansas deputy used the presence of an unspecified religious paraphernalia on the gear shift of a car in his reasonable suspicion calculus to justify a detention. *Id.* at 785–786.

In its reasonable suspicion analysis, the Tenth Circuit held that a number of the factors provided by the deputy were so broad that they were "indicative of nothing." *Id.* at 787. Among the factors found

to be impermissible was the presence of a religious symbol. *Id.* at 788. Drawing on a previous Tenth Circuit opinion and referencing this Court's decision in *Ramon,* the Tenth Circuit stated "[t]he presence of religious iconography in the vehicle is, similarly, not merely consistent with innocent conduct but so broad as to provide no reasonable indicium of wrongdoing." *Id.* at 788; *Cf. United States v. Valenzuela,* 365 F.3d 892, 900 (10th Cir.2004) (dismissing the government's argument that the presence of American flag decals on a car contributed to reasonable suspicion).

Although the Tenth Circuit ultimately determined other factors cited by law enforcement coalesced "into a scenario sufficient to give rise to a reasonable suspicion of criminal activity," the Court did not allow the presence of the religious symbol in its calculation.[12] *Guerrero,* 472 F.3d at 788.

In conclusion, because displaying a religious symbol on a vehicle constitutes symbolic speech, and is protected by the First Amendment, it is impermissible for law enforcement to use religious paraphernalia in their reasonable suspicion calculation. *Ramon,* 86 F.Supp.2d at 665; *Estep,* 310 F.3d at 353; *Townsend,* 305 F.3d at 537; *Guerrero,* 472 F.3d at 784. This Court finds that Magana's display of the Virgin Mary cannot be used to generate reasonable suspicion of drug dealing or general criminality. To do so violates the First

12. The Tenth Circuit noted that there may be a difference between generalized religious expression and pre-identified religious symbols. That Court stated that "[u]nder some circumstances, particular religious symbols—notably those identified with gangs—might provide meaningful indicia of reasonable suspicion. But by citing undifferentiated 'religious iconography' as grounds for reasonable suspicion, [the deputy] equates generalized religious expression with criminal activity, a connection that we cannot support as reason-

able." *Id.* at 788 (citing *United States v. Ramon* ).

This Court acknowledges that there may be instances when particular religious depictions or monikers will be used for example, by officers to identify criminal gangs who wear them as a emblem for affiliation. Today's ruling does not foreclose on the possibility of this type of situation. Here, and in *Ramon,* the officers concede that their suspicion is heightened not by a particular religious sects' symbol, but by *any general* religious display.

Amendment, and consequently, Magana's Fourth Amendment rights. To say otherwise, would be a de facto mandate for all citizens to remove any indicia of religion from their vehicles or else possibly face a governmentally sanctioned inference of criminality.

Because the Court has concluded Trooper Turk's consideration of the religious symbol as a factor was impermissible, the Court now turns to a discussion of the other factors in Trooper Turk's reasonable suspicion calculation.

### b. "US Air Force" Leather Jacket

■ A separate factor considered in Trooper Turk's reasonable suspicion calculus was the black jacket on Magana's back seat embroidered with the words "US Air Force." Trooper Turk used a similar argument with regard to the religious symbol—that patriotic symbols are often used to dispel suspicion and masquerade criminal activity. Under the analysis discussed above, the Court likewise finds this argument unconvincing. *See also Valenzuela,* 365 F.3d at 900 (discussing post September 11, 2001 displays of patriotism and dismissing the argument that an American flag decal contributed to reasonable suspicion).

The Court concludes the presence of the jacket does not rise to the level of creating a reasonable suspicion of criminal activity. When Trooper Turk questioned Magana about why he had a jacket in his car in the middle of summer in Texas, Magana responded he needed his jacket because it was raining in Laredo. Trooper Turk found this odd, because Magana chose to shield himself from the rain with a regular

jacket, and not a "rain" jacket. Regardless of the numerous explanations for Magana's apparel decision, the presence of the jacket does not rise to the level of creating a reasonable suspicion of criminal activity. The U.S. Air Force jacket alone, or considered in the aggregate with the other factors, does not provide particularized reasonable suspicion that a crime is being committed. Like the Bible in the passenger compartment in the *Townsend* case, the jacket is indicative of almost nothing. *See Townsend,* 305 F.3d at 540.

### c. Nervousness

■ Trooper Turk also stated one of the factors in his reasonable suspicion calculation was Magana's nervous behavior. *Gov't's Resp. to Def.'s Mot. to Suppress,* at 2. Specifically, Trooper Turk observed "Magana's hand to be shaking as he handed his license and insurance over." *Id.* Furthermore, Trooper Turk explains Magana responded to questions before he finished asking them. *Id.* at 9.

There is an abundance of case law on the issue of nervousness and the Court finds Trooper Turk's perception of Magana's nervous demeanor did not create reasonable suspicion of drug trafficking. *See United States v. Jenson,* 462 F.3d 399, 404–406 (5th Cir.2006) (driver taking long time to pull over, combined with talkativeness and nervous behavior, did not create reasonable suspicion of drug trafficking); *United States v. Santiago,* 310 F.3d 336, 340 (5th Cir.2002) (nervousness and conflicting stories from driver and passenger did not create reasonable suspicion to search for drugs). Even if Magana appeared nervous,[13] nervousness is never

---

**13.** After reviewing the videotape in detail, this Court does not interpret Magana's responses as exhibiting nervousness. The Court does not view Magana's answers to Trooper Turk's questions as rehearsed or being finished before they were asked. However, the Court also recognizes Trooper Turk has the everyday experience dealing with individuals pulled over for a traffic stop, and furthermore, the situation is to be viewed from that

enough alone. *Jenson,* at 404. Moreover, Trooper Turk admitted that individuals that he pulls over do get nervous. Tr. at 10. In sum, Trooper Turk's perception that Magana was nervous did not create reasonable suspicion.

The Court is mindful that when considering the factors in a reasonable suspicion calculus, the Court looks to the totality of the circumstances to see how convincingly the factors fit together into a cohesive picture of illegal conduct. *Arvizu,* 534 U.S. at 274, 122 S.Ct. 744. The Court notes that "reasonable suspicion may exist even if each observation is susceptible to an innocent explanation." *Guerrero,* 472 F.3d at 787 (internal quotes omitted) (citing *Arvizu,* 534 U.S. at 274, 122 S.Ct. 744). Considering the totality of the circumstances in the instant case, the Court concludes the jacket, taken together with Magana's nervous behavior, and any other inconsequential factors, do not provide particularized reasonable suspicion that a crime is being committed. Because the factors considered by Trooper Turk did not create reasonable suspicion, the detention of Magana beyond the point at which the purpose of the stop was fulfilled was unlawful. Furthermore, the subsequent search and seizure was not reasonably related in scope to the circumstances that justified the stop in the first place. The Government has not satisfied the second prong of the *Terry* stop analysis.

**2. The Purpose of the Stop Was Fulfilled**

■ In addition to finding Trooper Turk did not have reasonable suspicion to extend the stop, the Court finds the purpose of the stop was complete once Trooper

Turk examined the left rear tire and realized no Transportation Code violation had occurred. *See Valadez,* 267 F.3d at 398. Any detention beyond this point controverted Magana's Fourth Amendment rights. Magana's consent to search the vehicle and Trooper Turk's initiation of a criminal history check both occurred after the purpose of the stop was resolved. Therefore, neither justified an extended detention of Magana.

In *United States v. Valadez,* the Fifth Circuit held that because reasonable suspicion did not exist to extend a stop beyond the point it was realized that no violation had occurred, further detention was unlawful and contravened the defendant's Fourth Amendment rights. 267 F.3d at 398. The Fifth Circuit rejected the argument that regardless of when an officer realizes no violation has occurred, a stop is justified and not fulfilled until the results of computer checks come back. *Id.*

In *Valadez,* a Texas DPS trooper pulled over the defendant who was driving in the opposite direction in a vehicle that appeared to have an expired registration sticker and illegal window tinting. *Id.* at 396. Upon making contact with the defendant, and informing him of the reasons for the stop, the trooper acknowledged the registration sticker was valid. *Id.* However, the trooper indicated he still felt the window-tinting was illegal. *Id.* Before retrieving a window-tinting meter, the trooper asked for the defendant's driver's license and insurance card. *Id.* The trooper returned the insurance card, but retained the driver's license. *Valadez,* 267 F.3d at 396. When the trooper returned to his vehicle to get the window-tinting meter, he requested a driver's license check to see if

---

of a reasonable officer in Trooper Turk's situation. The Court acknowledges the great service our law enforcement officers give to the community, and appreciates Trooper Turk's

candidness in his testimony. His honesty is exactly what we would expect from law enforcement officers.

there were any outstanding warrants. *Id.* The trooper also requested a criminal history check. *Id.*

After the trooper initiated the checks, he inspected the window-tint and determined the tinting was legal. *Id.* At this point, the purpose of the stop was fulfilled. However, the trooper proceeded to question the defendant and learned the defendant had a loaded pistol on the front seat and a rifle in the trunk. *Id.* Shortly thereafter, the trooper retrieved the results of the computer checks, which revealed the defendant had a criminal history. *Valadez,* 267 F.3d at 396.

When asked about his criminal history, the defendant responded he thought his convictions were felony convictions. *Id.* The trooper informed the defendant it was illegal for a felon to possess a firearm and asked him to follow him to the jail house. *Id.* at 397. After it was confirmed that the defendant was a convicted felon, he was arrested. *Id.* After the district court denied his motion to suppress, the defendant entered a conditional guilty plea and appealed the ruling. *Id.* On appeal, the Fifth Circuit reversed the district court, concluding the evidence should have been suppressed. *Valadez,* 267 F.3d at 399.

The Fifth Circuit applied the two-tiered *Terry* Stop inquiry and determined there was "no evidence of any articulable, reasonable suspicion or probable cause that would have authorized [the trooper] to continue to detain [the defendant] once [the trooper] had determined that the window tinting was legal." *Id.* at 398. The court disagreed with the government's ar-

gument that the stop was allowed to continue until the results of the computer checks were returned. *Id.* The court stated that the Fifth Circuit cases cited by the government "can be distinguished from the case at hand." *Id.* The court stated that in cases such as *United States v. Dortch* and *United States v. Shabazz,* "the officers that requested the computer check had articulable, reasonable suspicion of wrongdoing that justified the continued detention of the drivers pending the results of the computer checks."[14] *Id.*

In *Valadez,* the court held that, unlike in *Dortch* and *Shabazz,* "there [was] simply no evidence to support a claim of reasonable suspicion beyond that which led to the initial stop. Further detention was not lawful after the point at which the purposes of the stop was resolved-that is, when [the officer] determined that [the defendant] had a proper inspection sticker and proper window tinting. There was then no further reason to detain [the defendant], and all that followed thereafter contravened [the defendant's] Fourth Amendment rights." *Id.*

The same analysis applies in the instant case. Without additional, articulable reasons to believe a crime was being committed, Trooper Turk lacked justification to extend the stop. *Valadez,* 267 F.3d at 398. Just as the purpose of the stop in *Valadez* ended once the trooper determined the window tinting was legal, the *purpose of the stop in the present case was fulfilled once Trooper Turk realized the tire was not defective.*[15] Similar to *Vala-*

---

14. *United States v. Dortch,* 199 F.3d 193 (5th Cir.1999) (observing driver who was traveling too close to a tractor-trailer in a vehicle rented to a third party and not being listed as an authorized driver); *United States v. Shabazz,* 993 F.2d 431 (5th Cir.1993) (observing a driver and passenger exceeding the speed limit

and giving conflicting answers concerning their recent whereabouts).

15. At this point in the stop, Trooper Turk was required to cite, arrest, or warn Magana, unless reasonable suspicion of another crime existed *See also Lopez–Moreno,* 420 F.3d at 431.

*dez*, and unlike *Dortch* and *Shabazz*, "there [was] simply no evidence to support a claim of reasonable suspicion beyond that which led to the initial stop." *Id.* Although Trooper Turk later initiated a criminal history check and received consent from Magana, this occurred after he realized no violation had occurred. The Court has previously stated that any detention after such realization was unlawful and controverted his Fourth Amendment rights.[16]

Furthermore, the Government concedes that the only way for the stop to legally continue after it was realized there was no violation committed, was with the existence of reasonable suspicion. The Government states that Trooper Turk "determined the tire was not defective but rather the rim of the wheel was bent. This would have normally ended all reason to detain Magana further, however, at the time that Turk made the determination that no traffic violation had been committed, Turk had additional reasons to extend the determination of Magana and investigate further." *Govt's Response,* at 8. As stated above, the Court finds Trooper Turk did *not* have particularized reasonable suspicion to extend the detention. Therefore, as the Government concedes, Trooper Turk's conclusion that the tire was not defective "ended all reason to detain Magana further." *Govt's Resp. to Def.'s Mot. to Suppress,* at 8.

## IV. Conclusion

For the foregoing reasons, the Court is of the opinion that religious symbols cannot be used to generate reasonable suspicion of drug dealing or criminality. To do so violates the First Amendment and consequently, the Fourth Amendment. After

removing the impermissible element of the religious symbol from the officer's reasonable suspicion calculation, the Court finds the remaining factors are not sufficient to create reasonable suspicion and therefore, did not warrant extending the detention. Because reasonable suspicion did not exist to extend the stop, once the officer realized a violation had not been committed, the purpose of the stop was fulfilled, and anything thereafter controverted Magana's Fourth Amendment rights. Therefore, the Court GRANTS Magana's Motion to Suppress (Docket No. 15).

It is so ORDERED.

---

16. Because Magana's consent to the search was the product of an unlawful detention, "the consent was tainted by the illegality and was ineffective to justify the search." *Royer,* 460 U.S. at 507–508, 103 S.Ct. 1319; see also

*Florida v. Bostick,* 501 U.S. 429, 433–434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (noting that if consent is given during the course of an unlawful seizure, the results of the search "must be suppressed as tainted fruit").